[Crim. No. 15533. In Bank. Nov. 4, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN M. SATCHELL, Defendant and Appellant.

**COUNSEL**

Brian M. Sax, under appointment by the Supreme Court, and Gregory S. Jensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SULLIVAN, J.**—In a two-count indictment defendant John M. Satchell was charged respectively with murder (Pen. Code, § 187) and assault with a deadly weapon upon a peace officer (Pen. Code, § 245, subd. (b)). As

amended the indictment also alleged four prior felony convictions. Defendant entered pleas of not guilty to the two substantive counts and admitted the four prior convictions. The jury acquitted him of the aggravated assault charged in the second count of the indictment but found him guilty of murder of the second degree. Defendant appeals from the judgment of conviction.

For the reasons set forth below we have concluded that it was prejudicial error for the trial court to instruct the jury on the theory of second degree felony murder. Accordingly we reverse the judgment.

The facts relevant to our determination can be briefly stated. On July 2, 1969, defendant and the victim Jordan became engaged in a heated argument on a public street in San Francisco. The argument progressed beyond mere harsh language when defendant shoved Jordan. The latter then withdrew some distance down the street; defendant went to his automobile, which was parked nearby and got in. A few minutes later Jordan returned and walked over to defendant's car. The argument then resumed, but it was abruptly terminated when defendant emerged from the car holding a sawed-off shotgun, shot Jordan once in the chest, and then drove off. Jordan died of the shotgun wound.

At trial defendant took the stand and testified that he had shot Jordan, with whom he had had no prior acquaintance, in self-defense when the latter threatened him and made movements which defendant interpreted as efforts to draw a weapon. A defense witness testified that Jordan had a gun in his hand at the time of the shooting, which gun was taken from the victim after defendant had departed.[1]

The trial court instructed the jury on the definition of murder and malice (CALJIC No. 301 (supp.))[2] and the degrees of murder (CALJIC Nos. 302 and 302-A), but it eliminated first degree murder from the consideration of the jury by indicating that none of the felonies enumerated in section 189 of the Penal Code was here involved and by not instructing on premeditation. (See CALJIC No. 303 (supp.).) The jury was fully instructed on second degree murder, however, and the following instruction on second degree felony murder was given: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs

---

[1]The charge of aggravated assault upon a police officer, of which defendant was acquitted, arose out of circumstances surrounding defendant's arrest later in the day.

[2]Unless otherwise indicated, all references to "CALJIC" herein are to California Jury Instructions—Criminal (rev. ed. 1958). The abbreviation "supp." in parentheses following any instruction indicates that reference is made to the 1967 pocket supplement to that work. At the time of trial the 1970 third revised edition had not yet been published.

as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of *possession of a concealable firearm by a felon,* and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree. [Par.] The specific intent to commit *the crime of possession of a concealable firearm by a felon* and the commission of or attempt to commit such crime must be proved beyond a reasonable doubt."[3]

The trial court went on to give a series of instructions[4] defining and explaining the crime of possession of a concealable firearm by a felon. (Pen. Code, § 12021; see Pen. Code, § 12001.)[5]

Finally, the court gave instructions concerning manslaughter, heat of passion, and provocation,[6] and instructions concerning justifiable homicide and self-defense.[7] Among the manslaughter instructions given was CALJIC No. 310 (supp.), which provided in part: "If a person *while committing a felony* causes another's death, malice is implied, and the crime is murder."[8] (Italics added.)

---

[3] Although CALJIC (3d ed. 1970) had not been published at the time of trial, the second degree felony-murder instruction given was identical to that which subsequently appeared in that edition—the underscored words being added by the court as contemplated by the instruction to fit the circumstances of the particular case. Apparently the former second degree murder instruction (CALJIC No. 305 (supp.)) was broken down into three instructions (now CALJIC (3d ed. 1970) Nos. 8.30, 8.31, and 8.32) following our decision in *People* v. *Sears* (1965) 62 Cal.2d 737 [44 Cal.Rptr. 330, 401 P.2d 938], and copies of the new instructions were distributed by the Committee on CALJIC of the Los Angeles Superior Court on December 27, 1968, prior to the trial of the instant case.

[4] CALJIC Nos. 746, 746-A, 746-D, 747, 748.

[5] Section 12021 of the Penal Code at the time here pertinent provided: "Any person who is not a citizen of the United States and any person who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government, or country, or who is addicted to the use of any narcotic drug, who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person is guilty of a public offense, and shall be punishable by imprisonment in the state prison not exceeding 15 years, or in a county jail not exceeding one year or by a fine not exceeding five hundred dollars ($500), or by both."

Section 12001 of the Penal Code at the time here pertinent provided in relevant part: " 'Pistol,' 'revolver,' and 'firearm capable of being concealed upon the person' as used in this chapter shall apply to and include any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or any other form of combustion, and which has a barrel less than 12 inches in length. . . ." The sawed-off shotgun involved in this case had a barrel 11¾ inches in length.

[6] CALJIC Nos. 305-AA (supp.), 308-A (supp.), 310, 310 (supp.), and 311.

[7] CALJIC Nos. 321-J, 322, 322-A, 327, and 327-A.

[8] Compare CALJIC (3d ed. 1970) No. 8.51: "If a person *while committing a felony inherently dangerous to human life* causes another's death, malice is implied, and the crime is murder." (Italics added.)

The jury deliberated for two full days before reaching their verdict. Four times in the course of their deliberations the jury requested that the court reinstruct them on murder, manslaughter, and justifiable homicide. Questions put to the court by the jury foreman indicate that the jury's primary concern was the operation of the second degree felony-murder instruction in the context of the other homicide instructions.[9] At the end of the second day of deliberations the jury returned their verdict finding defendant guilty of second degree murder (and not guilty of the aggravated assault charged in the second count of the indictment).

Defendant moved for a new trial on the ground that the second degree felony-murder instruction should not have been given, but the motion was denied. He appeals from the judgment of conviction on the same ground among others.[10] We have concluded that his contention must be sustained.

In the case of *People* v. *Washington* (1965) 62 Cal.2d 777, at page 783 [44 Cal.Rptr. 442, 402 P.2d 130], this court struck the keynote which has guided all our subsequent consideration of cases involving the felony-murder doctrine. Acknowledging the substantial body of legal scholarship which has concluded that that doctrine not only "erodes the relation between criminal liability and moral culpability" but also is usually unnecessary for conviction,[11] we went on to say of it: "Although it

---

[9] Thus, during the afternoon of the first day the foreman asked the court: "Your Honor, may I ask in relation to the voluntary manslaughter, if there is possession of the gun but it still follows your definition [i.e., of voluntary manslaughter], is it still just voluntary manslaughter, or are there conditions where it wouldn't be when there is wrongful possession of the gun?" Later, during the evening of the first day, the foreman asked the court: "Well, suppose that man is—feloniously has a weapon, and he has no right to that weapon, that is understood, he feloniously has it, but he does not commit a crime, and someone attacks him, does he still have the right to defend himself?"

[10] We do not consider that defendant, by failing to raise a specific objection to the second degree felony-murder instruction when it was given, thereby waived his right to challenge that instruction on appeal. The trial court's duty in a criminal case to instruct on the general principles of law relevant to the issues raised by the evidence (see *People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820]) includes a correlative duty to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues. (See, for example, *People* v. *Ireland* (1969) 70 Cal.2d 522, 539, fn. 13 [75 Cal.Rptr. 188, 450 P.2d 580] and accompanying text.) "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259.)

[11] "It may be that the rule is unnecessary in almost all cases in which it is applied, that is to say, that conviction in those cases can be predicated on the normal rules as to murder and as to accomplice liability. In the small residuum of cases, there may be a substantial question whether the rule reaches a rational result or does not

is the law in this state (Pen. Code, § 189), *it should not be extended beyond any rational function that it is designed to serve."* (Italics added.)

Applying this principle to various concrete factual circumstances, we have sought to insure that the "highly artificial concept" (*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]) of strict criminal liability incorporate in the felony-murder doctrine be given the narrowest possible application consistent with its ostensible purpose— which is to deter those engaged in felonies from killing negligently or accidentally (see *People* v. *Washington, supra*, 62 Cal.2d 777, 781, and authorities there cited). Thus, for example, we have refused to apply the doctrine in cases wherein the killing is committed by persons other than the defendant or an accomplice acting in furtherance of a common felonious design (*People* v. *Washington, supra*, 62 Cal.2d 777, 781-783); in cases wherein the operation of the doctrine depends upon "a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged" (*People* v. *Ireland, supra*, 70 Cal.2d 522, 539, fn. omitted; see *People* v. *Wilson* (1969) 1 Cal.3d 431, 437-442 [82 Cal.Rptr. 494, 462 P.2d 22], and *People* v. *Sears* (1970) 2 Cal.3d 180, 185-189 [84 Cal. Rptr. 711, 465 P.2d 847]; cf. *People* v. *Mattison* (1971) 4 Cal.3d 177, 185-186 [93 Cal.Rptr. 185, 481 P.2d 193]; *People* v. *Calzada* (1970) 13 Cal.App.3d 603 [91 Cal.Rptr. 912]); and in cases wherein the underlying felony is not one of the six enumerated in section 189 of the Penal Code and is not inherently dangerous to human life (see *People* v. *Phillips, supra*, 64 Cal.2d 574, 582-584; *People* v. *Williams* (1965) 63 Cal.2d 452, 457-458 [47 Cal.Rptr. 7, 406 P.2d 647]).[12]

---

at least distract attention from more relevant criteria." (Fn. omitted.) (Packer, *The Case for Revision of the Penal Code* (1961) 13 Stan.L.Rev. 252, 259.)

"If, the defendant commits the felony in a highly reckless manner, he can be convicted of second degree murder independently of the shortcut of the felony-murder rule. Under California's interpretation of the implied malice provision of the Penal Code [§ 188], proof of conduct evidencing extreme or wanton recklessness establishes the element of malice aforethought required for a second degree murder conviction. [See *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 (51 Cal.Rptr. 225, 414 P.2d 353).] If. facts exist such as those in *People* v. *Pulley* [see fn. 16, *post*], the prosecutions would be free to prove the extreme recklessness of the conduct. The jury would decide whether the evidence, including the defendant's conduct and inferences rising from it, established the requisite malice aforethought; they would not be bound by the conclusive presumption of malice which the felony murder rule compels." (Fns. omitted.) (Note (1967) 55 Cal.L.Rev. 329, 340.)

[12]In *Williams* we stated that the ostensible purpose of the felony-murder rule "may be well served with respect to felonies such as robbery or burglary, but it has little relevance to a felony which is not inherently dangerous. If the felony is not inherently dangerous it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony." (63 Cal.2d at pp. 457-458, fn. 4.)

In the instant case it is clear that the victim was killed by defendant while he was engaged in the commission of a felony[13] other than the six enumerated in section 189 of the Penal Code. Thus, in determining whether the felony-murder doctrine is properly applicable the threshhold inquiry is whether the felony in which defendant was engaged was a "felony inherently dangerous to human life" within the meaning of *People v. Phillips, supra,* 64 Cal.2d 574, and *People v. Williams, supra,* 63 Cal.2d 452. If the felony in question was not such an inherently dangerous felony, the felony-murder instruction given was without legal foundation and the judgment must be reversed if the giving of that instruction was prejudicial.[14]

At the outset it is clear that this court has unequivocally held on more than one occasion that the offense set forth in section 12021 is a felony (see fn. 13, *ante*) capable of supporting a second degree felony-murder instruction. (See *People v. Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 829] and (1966) 65 Cal.2d 41, 57 [52 Cal.Rptr. 228, 416 P.2d 132]; *People v. Schader* (1965) 62 Cal.2d 716, 732 [44 Cal.Rptr. 193, 401 P.2d 665]; *People v. Robillard* (1960) 55 Cal.2d 88, 98 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) It is equally clear, however—in light of our continuing concern that the felony-murder doctrine not be extended beyond its rational function—that those decisions cannot be invested with a vitality independent from the developing concept of inherent danger exemplified by our *Phillips* and *Williams* cases. (See fn. 12, *ante.*) Rather, our task today is to assess the cited decisions as they relate to that concept and determine whether or not the conclusion announced by them is consistent therewith and should endure. "[T]he branch cannot bear fruit by itself, except it abides in the vine." (John XV, 4.)

It is useful to consider the subject decisions within the chronological development of the principle of inherent danger. That principle, although it was foreshadowed in *People v. Poindexter* (1958) 51 Cal.2d

---

[13]The "public offense" defined in section 12021 of the Penal Code (see fn. 5, *ante*) may be punished either as a felony or as a misdemeanor in the discretion of the sentencing judge. However, such a felony-misdemeanor "stands as a felony for every purpose up to judgment" (*Doble* v. *Superior Court* (1925) 197 Cal. 556, 577 [241 P. 852]), and "evidence that the killing was in the perpetration of an alternatively punishable offense supports a determination that the homicide was second degree murder in the perpetration of a felony. (*People* v. *Doyle* (1958) 162 Cal.App.2d 158, 161 [3] [328 P.2d 7].)" (*People* v. *Banks* (1959) 53 Cal.2d 370, 382, fn. 7 [1 Cal.Rptr. 669, 348 P.2d 102].)

[14]Clearly the question whether the underlying felony is inherently dangerous and therefore capable of supporting a second degree felony-murder instruction logically precedes the question whether such a felony merges with the charged homicide crime and is therefore not subject to utilization as the basis of such an instruction.

142, at page 149 [330 P.2d 763], was first stated as positive law in *People* v. *Ford* (1964) *supra*, 60 Cal.2d 772 at page 795: "A homicide that is a direct causal result of the commission of *a felony inherently dangerous to human life* (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder." (Italics added.)[15] That case itself involved a violation of section 12021, and this court, looking to the facts of the particular case and relying on the prior (i.e., pre-*Ford*) decision in *People* v. *Robillard* (1960) *supra*, 55 Cal.2d 88, 98, concluded that that offense was inherently dangerous to human life and could properly support a second degree felony-murder instruction. This conclusion was followed in *People* v. *Schader* (1965) *supra*, 62 Cal.2d 716, 732, citing *Ford* and *Robillard* and again looking to the facts of the particular case which involved the armed holdup of a store by a previously convicted felon.

However, in 1965 we held that, in assessing whether a felony was inherently dangerous within the meaning of *Ford*, "we look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Williams* (1965) *supra*, 63 Cal.2d 452, 458, fn. 5.) There the victim, an illegal supplier of methedrine, was killed with a knife during an affray which resulted after defendants demanded that he pay a debt either in methedrine or in money. The jury was given a second degree felony-murder instruction based upon the crime of conspiracy to possess methedrine without a prescription. We held that the instruction was erroneous because the subject felony, viewed in the abstract "is surely not, as such, inherently dangerous." (63 Cal.2d at p. 458.)[16]

---

[15]The prior law was stated in *People* v. *Doyell* (1874) 48 Cal. 85, at pages 94-95, as follows: "Whenever one, in doing an act with the design of committing a felony, takes the life of another, even accidentally, this is murder. (Acts of 1850, p. 220, Sec. 25; 2 Bish. Cr. L. 741.) In such homicides the law superadds the intent to kill to the original felonious intent thus imputed. The thing done having proceeded from a corrupt mind, is to be viewed the same, whether the corruption is of one particular form or another. (Ruth. Inst., Ch. 18, Sec. 9; 1 Bish. Cr. L. 411.) [Par.] The amendment (of 1856) of the Act of 1850, 'concerning crimes and punishments' did not change the law of murder, done in the attempt to commit a felony. It only prescribes a severer punishment where the murder is committed in the attempt to perpetrate arson, rape, robbery or burglary (on account of the enormity of these offenses), than where it is committed in carrying out any other felonious design."

[16]In holding that the felony must be viewed in the abstract we disapproved any contrary implications in *People* v. *Pulley* (1964) 225 Cal.App.2d 366, 373 [37 Cal.Rptr. 376]. There it was held that a second degree felony-murder instruction was properly based on a violation of section 10851 of the Vehicle Code, automobile theft, because the theft in question led to a high speed chase and a collision which took the life of the victim. The Court of Appeal stated in that case: "By any reasonable standard, stealing and driving a stolen car and endeavoring to escape pursuing officers with the stolen car, entering an intersection against all rules of the road at 70 to 80 miles per hour and crashing with other cars lawfully proceeding therein, are

The teaching of *Williams* was applied and explained in *People* v. *Phillips* (1966) *supra,* 64 Cal.2d 574. There the defendant, a chiropractor, was tried for murder following the death from cancer of a patient whom he dissuaded from surgery and purported to treat through chiropractic methods. The jury was given a second degree felony-murder instruction based upon the crime of grand theft by false pretenses. (Pen. Code, §§ 484, 487.) Holding that the crime of grand theft, viewed in the abstract, was not inherently dangerous to human life, we went on to reject the contention of the prosecution that the subject felony should be characterized in light of the defendant's actual conduct as "grand theft medical fraud," assertedly an inherently dangerous offense. "To fragmentize the 'course of conduct' of defendant so that the felony-murder rule applies if any segment of that conduct may be considered dangerous to life would widen the rule beyond calculation. It would then apply not only to the commission of specific felonies, which are themselves dangerous to life, but to the perpetration of *any* felony during which defendant may have acted in such a manner as to endanger life. [Par.] The proposed approach would entail the rejection of our holding in *Williams*. That case limited the felony-murder doctrine to such felonies as were themselves inherently dangerous to life. That decision eschews the prosecution's present sweeping concept because, once the Legislature's own definition is discarded, the number or nature of the contextual elements which could be incorporated into an expanded felony terminology would be limitless. We have been, and remain, unwilling to embark upon such an uncharted sea of felony murder." (64 Cal.2d at pp. 583-584.)

The opportunity to apply the principles of *Williams* and *Phillips* to the offense here in question (Pen. Code, § 12021) arose in the second *Ford* appeal. (*People* v. *Ford* (1966) *supra,* 65 Cal.2d 41.) However, we did not avail ourselves of that opportunity but instead quoted language from the first (i.e., pre-*Williams*) appeal in concluding that a conviction of second degree murder was justified on a felony-murder theory.

The foregoing chronological review clearly shows that the prior decisions of this court concerning violation of Penal Code section 12021 as a basis for felony murder have applied a standard different from that required by our *Williams* and *Phillips* cases in that they have not undertaken to view that felony in the abstract when assessing the danger to human life inherent in its commission. ■ Accordingly, in addressing ourselves to that task for the first time today, we decide what is in effect

highly dangerous." (225 Cal.App.2d at p. 373.) Our insistence in *Williams* that the felony be viewed in the abstract necessarily precludes a determination of inherent danger based upon this kind of reasoning.

a question of novel impression in this court: *Viewed in the abstract,* is the possession of a concealable firearm by a person who has previously been convicted of a felony an offense inherently dangerous to human life?

We first consider two decisions of the Court of Appeal which have treated this question. In *People* v. *Lovato* (1968) 258 Cal.App.2d 290 [65 Cal.Rptr. 638], the specific issue before the court was whether the possession of a concealable firearm by an *alien* (which is also proscribed by section 12021 of the Penal Code) was an offense inherently dangerous to human life capable of supporting a second degree felony-murder instruction. The Court of Appeal, over the dissent of one of the three justices, held that it was not. Viewing the crime in the abstract as required by the *Williams-Phillips* principle, the court[17] concluded: "It is common knowledge that several million aliens are living in this country and that the vast majority are peaceful and law-abiding. Undoubtedly, many are serving or have children serving in the armed forces. Consequently, to categorically hold that every alien who is intentionally in possession of a concealable weapon, regardless of the reason, is guilty of an offense inherently dangerous to human life, and hence is guilty of murder in the second degree if the offense results in a homicide, under every possible circumstance we can visualize, would manifestly lead to unjust and even absurd results. Moreover, to in effect state that a person's citizenship is the controlling factor as to whether a homicide was committed with malice is not only illogical but would constitute an affront to the judiciary which through the years has constantly striven to find compelling reasons rather than arbitrary distinctions before making rules which result in differing treatment of people." (258 Cal.App.2d at p. 293.)

It was urged upon the court, however, that in light of the line of cases holding that possession of a concealable firearm by a *felon* was inherently dangerous to life (i.e., *Schader* and the two *Ford* cases), the same result should follow in cases involving aliens. In answering this contention the court, still applying the *Williams-Phillips* principle of considering the felony in the abstract, stated: "[W]e conclude that there is a clear, rational and logical distinction between the nature of the offense when committed by an ex-felon and when committed by an alien. *An ex-felon by his felony conviction has demonstrated instability and a propensity for crime. Thus, there is a core of logic in the assumption that if such a person arms himself with a concealable weapon he commits a crime per se dangerous to human life.* However, a person does not demonstrate instability, nor does he show a tendency toward crime, simply because he is not a citizen of this country.

---

[17]The specific language here quoted was approved only by its author, for the concurring justice concurred "in the result" and wrote a separate opinion.

Consequently, although it may be reasonable for the Legislature to include aliens within the ambit of section 12021 for regulatory purposes, it would be illogical and unreasonable for a court to hold that every alien who violates the section necessarily commits a crime inherently dangerous to human life." (Italics added.) (258 Cal.App.2d at pp. 295-296.)

The italicized language, clearly dictum in *Lovato*, was made the basis of the holding in *People* v. *Asher* (1969) 273 Cal.App.2d 876, 899 [78 Cal.Rptr. 885], where it was concluded that manslaughter instructions were properly rejected because the jury's recourse to evidence of diminished capacity to entertain malice was correctly foreclosed by a second degree felony-murder instruction based upon violation of section 12021 by an ex-felon.

While we agree with the approach and reasoning of the *Lovato* court in assessing the danger inherent in the crime of possession of a concealable firearm by an *alien*, we believe that its dictum concerning such possession by an *ex-felon* departs from that approach and reasoning and reaches an incorrect conclusion. Thus, we cannot agree that, whereas on the one hand it would be "illogical" and "arbitrary" to conclude "that a person's citizenship is the controlling factor as to whether a homicide was committed with malice" (258 Cal.App.2d at p. 293), yet on the other hand "there is a core of logic" in the conclusion that the presence or absence of a felony conviction on a person's past record should have such a controlling effect. The logical process by which this conclusion is reached fails to proceed beyond its own major premise: granting that "[a]n ex-felon by his felony conviction has demonstrated instability and a propensity for crime" (258 Cal.App.2d at p. 295), one cannot logically achieve the conclusion that such a person, when he arms himself, commits a crime inherently dangerous to human life, unless it also be shown that one who so demonstrates instability and a propensity for crime is inherently disposed toward acts dangerous to human life. We do not think that this has been shown. To borrow the phrasing of the *Lovato* court, we have concluded that "to in effect state that [the presence or absence of a felony conviction on a person's past record] is the controlling factor as to whether a homicide was committed with malice is not only illogical but would constitute an affront to the judiciary which through the years has constantly striven to find compelling reasons rather than arbitrary distinctions before making rules which result in differing treatment of people." (258 Cal.App.2d at p. 293.)

It bears emphasis that, in determining whether a felony is inherently dangerous for purposes of the felony-murder rule we assess that felony *in the abstract*. The felony here in question is possession of a con-

cealable firearm by one who has previously been convicted of a (i.e., another) felony.[18] We do *not* look to the specific facts of the case before us in order to determine whether, in light of the nature of the particular felony of which defendant was previously convicted, his possession of a concealable firearm was inherently dangerous. Rather, we direct our attention to the genus of crimes known as felonies and determine whether the possession of a concealable firearm by one who has been convicted of *any crime within that genus* is an act inherently dangerous to human life which, as such, justifies the extreme consequence (i.e., imputed malice) which the felony-murder doctrine demands.

It is manifest that the range of antisocial activities which are criminally punishable as felonies in this state is very wide indeed. Some of these felonies, such as certain well-known crimes against the person of another, distinctly manifest a propensity for acts dangerous to human life on the part of the perpetrator. Others, of which a random sampling is set forth in the margin,[19] just as distinctly fail to manifest such a propensity. Surely it cannot be said that a person who has committed a crime in this latter category, when he arms himself with a concealable weapon, presents a danger to human life so significantly more extreme than that presented by a non-felon similarly armed[20] as to justify the imputation of malice to him if a homicide should result. ■ Accordingly, because we can conceive of such a vast number of situations wherein it would be grossly illogical to impute malice, we must conclude that the violation of section 12021 by one previously convicted of a felony is not itself a felony *inherently* dangerous

---

[18]Unfortunately, the compound nature of the felony here considered requires that we make reference not only to that felony (possession of a concealable firearm by an ex-felon) but also to the previous felony conviction which renders such possession felonious.

[19]See, for example, Corporations Code, sections 3019-3021, 25540 et seq. (fraudulent and deceptive acts relating to corporations); Elections Code, sections 12000 et seq., 14403, 15280, 17090 et seq., 29100 et seq., 29130 et seq., 29160, 29180, 29400, 29430, 29431 (elections offenses); Financial Code, section 18857.1 (unauthorized sale of investment certificates); Government Code, section 9050 et seq. (interference with the legislative process), section 9908 (crimes of legislative representatives); Insurance Code, section 556 (false or fraudulent insurance claim), section 833 (crimes in the issuance of insurance securities); Military and Veterans Code, section 421 (conversion of military property); Public Resources Code, section 5190 (interest of park commissioner in park contract); Vehicle Code, section 4463 (false evidence of registration).

The Penal Code, of course, renders felonious many activities which do not indicate a propensity for dangerous acts.

[20]It is, of course, unlawful for *any* nonexempt person to carry a concealed weapon unless he has a license to do so. However, unless such a person is an ex-felon or has been previously convicted of a concealed weapons offense, he is guilty of only a misdemeanor. (Pen. Code, § 12025.)

to human life which will support a second degree felony-murder instruction.

■ Thus, it was error in this case to give a second degree felony-murder instruction based upon defendant's violation of section 12021 of the Penal Code. That error was clearly prejudicial because it "relieved the jury of the necessity of finding one of the elements of the crime of murder" (*People* v. *Phillips, supra,* 64 Cal.2d 574, 584), to wit, malice aforethought. "The denial of defendant's right to a determination by the jury as to whether he acted with malice resulted in a miscarriage of justice within the meaning of California Constitution, article VI, section [13]." (*Id.* at p. 585.) The judgment must, therefore, be reversed.

Our consideration of an issue which may arise upon retrial reveals an even more fundamental reason why the felony-murder instruction was erroneous in this case.

■ Although the jury was given a second degree felony-murder instruction based upon section 12021 of the Penal Code, it was not given such an instruction based upon section 12020 of the same code. That section, which is set forth in full in the margin,[21] provides in substance as here relevant that *any person* who possesses a sawed-off shotgun is guilty of a felony. Because a second degree felony-murder instruction based on section 12020 may be offered on retrial, we deem it incumbent to determine whether the offense proscribed by that section, viewed in the abstract, is inherently dangerous to human life. We conclude that it is not, and that therefore a violation of section 12020 may not properly support a second degree felony-murder instruction.

■ This court has stated that the purpose of the Legislature in enacting section 12020 was to outlaw the possession of "weapons common to the criminal's arsenal. . . ." (*People* v. *Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100].) This purpose proceeds from the recogni-

---

[21]"Any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, *sawed-off shotgun,* or metal knuckles, or who carries concealed upon his person an explosive substance, other than fixed ammunition or who carries concealed upon his person any dirk or dagger, is guilty of a felony, and upon conviction shall be punishable by imprisonment in the county jail not exceeding one year or in a state prison for not less than one year nor more than five years.

"As used in this section a 'sawed-off shotgun' means a shotgun having a barrel or barrels of less than 18 inches in length, or a rifle having a barrel or barrels of less than 16 inches in length, or any weapon made from a rifle or shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than 26 inches." (Italics added.)

tion that persons who possess the specialized instruments of violence listed in the section are ordinarily persons who intend to use them in violent and dangerous enterprises. Thus, rather than simply proscribing the *use* of such instruments, the Legislature has sought to prevent such use by proscribing their mere *possession*. In order to insure the intended prophylactic effect, the intent or propensity for violence of the possessor has been rendered irrelevant. Thus, in *People* v. *Ferguson* (1933) 129 Cal.App. 300 [18 P.2d 741], the defendant was convicted of possessing "metal knuckles" under the subject section. There was evidence that he received the knuckles from his father; that he never carried them on his person; and that he kept them as a keepsake or curio. The Court of Appeal held that the purpose or motive for possession was irrelevant to the defendant's conviction. While withholding any opinion upon the question whether a museum keeper could be convicted under the same section, the court said: "It is evident to us that the effective prohibition of the criminal use of weapons of this sort depends upon the right to prohibit possession thereof, and that the law does not intend to and does not in fact make any exceptions of heirlooms, curios or keepsakes of individuals." (129 Cal.App. at p. 305; see also *People* v. *Stinson* (1970) 8 Cal.App.3d 497 [87 Cal.Rptr. 537]; *People* v. *McKinney* (1935) 9 Cal.App.2d 523 [50 P.2d 827]; cf. *People* v. *Grubb, supra,* 63 Cal.2d 614, 621, fn. 9; *People* v. *Deane* (1968) 259 Cal.App.2d 82 [66 Cal.Rptr. 177].)

While we have no doubt that—as the *Ferguson* court held—the proscription of the mere possession of articles of this sort lies within the constitutional competency of the Legislature, we decline to hold that such a statute, which makes no distinction between the innocent "collector" and the hardened criminal, can be utilized to posit malice aforethought in a prosecution for murder. Looking at the subject felony in the abstract, as we are required to do, it appears that to permit the application of the felony-murder doctrine on the ground of violation of section 12020 would "erode[ ] the relation between criminal liability and moral culpability" beyond all recognition and would extend the operation of that doctrine "beyond any rational function that it is designed to serve." (*People* v. *Washington, supra,* 62 Cal.2d 777, 783.)

Viewing the matter from the standpoint of inherent danger, we find it difficult to understand how any offense of mere passive possession can be considered to supply the element of malice in a murder prosecution. To be sure, if such possession is of an extremely reckless nature manifesting a conscious disregard for human life, malice may be imputed by means of basic murder principles. (See fn. 11, *ante.*) Moreover, if passive possession

ripens into a felonious *act* in which danger to human life is inherent,[22] the purpose of the felony-murder rule is served by its application—for it is the deterrence of such acts by felons which the rule is designed to accomplish. However, mere possession *in itself*—ignoring the propensities and conduct of the possessor—is essentially neutral in its intentional aspect and should not serve as the basis for the imputation of malice.

We emphasize in closing that our decision in this case, by refusing to permit application of the felony-murder doctrine to the felonies here in question, does not thereby insulate from murder liability all those who kill while engaged in the commission of such felonies. Under well-settled principles of criminal liability a person who kills—whether or not he is engaged in an independent felony at the time—is guilty of murder *if he acts with malice aforethought*. The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it. When the killer is not engaged in such a felony, however, and the imputation of malice through the doctrine is therefore precluded, still it may be shown in accordance with normal murder principles that the fatal act was done with malice aforethought and, therefore, constitutes murder. Thus, the determination that an underlying felony will not properly support a felony-murder instruction simply removes the short-circuit provided by that doctrine and requires that the existence of the crucial mental state be demonstrated to the trier of fact.

The judgment is reversed.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment because I do not believe the error has resulted in a miscarriage of justice. The judgment, therefore, should not be reversed, for the reason that article VI, section 13, of the California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the

---

[22]A ready example, among the many which might be suggested, is the act forbidden by section 246 of the Penal Code, discharging a firearm at an inhabited building. (See also *People* v. *Nichols* (1970) 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673].)

jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."