103 Cal.App.3d 89 (1980)
162 Cal. Rptr. 827
THE PEOPLE, Plaintiff and Respondent,
v.
COURTNEY GLEN GAINES, Defendant and Appellant.
Docket No. 18653.
Court of Appeals of California, First District, Division One.
March 5, 1980.
*91 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, and Robert P. Mason, Deputy State Public Defender, for Defendant and Appellant.
George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and John W. Runde, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
ELKINGTON, J.
Upon his arrest with another on suspicion of having committed armed robbery, defendant Gaines remained silent. The record does not indicate whether he had at the time been admonished according to the requirement of Miranda (Miranda v. Arizona (1966) *92 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). (We, as do the parties, assume that he had not been.)
At his trial, testifying on his own behalf, Gaines claimed that the complaining witness had instead robbed him at gunpoint, and that the incriminating circumstances of his (Gaines') flight were the product of his fear of the purported victim. On cross-examination the trial court, over objection, permitted the prosecutor's repeated and detailed questions, whether Gaines had told the arresting officers that he himself had been a robbery victim, or of the reasons for his flight.

I.
(1) Upon appeal from his conviction of the charged robbery Gaines first cites the trial court's ruling as prejudicial error, and the subject cross-examination as prejudicial prosecutorial misconduct. His principal reliance is upon Doyle v. Ohio (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], and People v. Andrews (1970) 14 Cal. App.3d 40 [92 Cal. Rptr. 49].
The background cause of our concern is, of course, Griffin v. California (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229], which as here relevant, holds "that the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."
More recently the same high court in United States v. Hale (1975) 422 U.S. 171 [45 L.Ed.2d 99, 95 S.Ct. 2133], was presented with a problem somewhat similar to ours. Following his arrest for robbery and appropriate Miranda warnings, Hale had chosen to remain silent. Thereafter, when a search disclosed a large amount of money in his pocket and a policeman asked about the money's source, he made no response. At Hale's trial he testified that the money had not been taken from the complaining witness, but was the proceeds of a welfare check given him by his estranged wife. On cross-examination the following questions and answers were asked and given (p. 174 [45 L.Ed.2d, pp. 103-104]): "`Q. Did you in any way indicate [to the police] where that money came from? A. No, I didn't. Q. Why not? A. I didn't feel that it was necessary at the time.'"
*93 Not on constitutional grounds, but "in the exercise of [its] supervisory authority over the lower federal courts" (p. 181 [45 L.Ed.2d, p. 107]), the court upheld the reversal of Hale's conviction, stating (p. 180 [45 L.Ed.2d, p. 107]): "Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest. [¶] ... We now conclude that the respondent's silence during police interrogation lacked significant probative value and that any reference to his silence under such circumstances carried with it an intolerably prejudicial impact." (Fn. omitted.) The authority, of course, is not directly binding upon us as a state court but its rationale is nevertheless persuasive.
Soon after, Doyle v. Ohio, supra, 426 U.S. 610, was before the high court. There also the accused was arrested, and when given the Miranda admonition he remained silent. At his trial he explained, in a manner consistent with his innocence, the otherwise incriminating evidence of $1,320 found in his possession. The prosecutor, with other such questions, then asked (p. 614 [49 L.Ed.2d, p. 95]), "`if that is all you had to do with this and you are innocent, when [the officer] arrived on the scene why didn't you tell him?'" This time, on federal constitutional grounds the court reversed a state conviction, by a decision which is binding on us.
In Doyle, as apparently in the case here at bench, the state sought (p. 616 [49 L.Ed.2d, p. 97]) "only the right to cross-examine a defendant as to post-arrest silence for the limited purpose of impeachment." The court held (p. 619 [49 L.Ed.2d, p. 98]) "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment."
In People v. Andrews, supra, 14 Cal. App.3d 40, it will reasonably be inferred that it was after Andrews was arrested and admonished according to Miranda, that he elected to, and did, remain silent. Later at his trial he testified that at the time of the charged crime which was a robbery perpetrated by means of an automobile, he was asleep in the *94 car's rear seat, a circumstance earlier unexplained to the police. The following proceedings occurred on cross-examination (p. 47): "`Q. All right. Fine. Now answer this question: When did you ever tell anybody in law enforcement that you were asleep in the back of that car other than today from that witness stand? Mr. Firth [defense counsel]: Objected to if the Court please. The Court: Objection will be sustained. Mr. Regan [prosecutor]: Q. Have you ever told anybody that? Mr. Firth: Same objection. The Court: Same ruling.'"
The appellate court reversed Andrews' conviction for prejudicial prosecutorial misconduct in the violation of a right "of constitutional origin."
Other authority finding error in the use of evidence of an accused's silence following advice of his right to remain silent will be found in People v. Haston (1968) 69 Cal.2d 233, 254-256 [70 Cal. Rptr. 419, 444 P.2d 91]; People v. Cockrell (1965) 63 Cal.2d 659, 669-670 [47 Cal. Rptr. 788, 408 P.2d 116] (cert. den., 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]), and see authority there cited; People v. Barker (1979) 94 Cal. App.3d 321, 327-328 [156 Cal. Rptr. 407], and see authority there cited.
But as we have indicated, in each of the above cases the accused's silence followed a Miranda or other warning of his right, among others, to remain silent, a circumstance not present in the case before us. It may accordingly be argued that the essence of those cases, i.e., Miranda error, does not exist here, causing them to be unauthoritative.
Further examination of Doyle v. Ohio, supra, 426 U.S. 610, discloses the judicial conclusions that "silence at the time of arrest may be inherently ambiguous even apart from the effect of Miranda warnings" (pp. 617-618, fn. 8 [49 L.Ed.2d, p. 97]); and that the error does not depend upon previous Miranda warnings, but "lies in the cross-examination on this question [of postarrest silence], thereby implying an inconsistency that the jury might construe as evidence of guilt" (p. 619, fn. 10 [49 L.Ed.2d, p. 98]). The evil lies in the "insoluble ambiguity" of such evidence, which in the language of United States v. Hale, supra, 422 U.S. 171 (adopted or relied upon by Doyle v. Ohio, supra), "is of little probative force" (422 U.S., p. 176 [45 L.Ed.2d, p. 104]), for these reasons: "At the time of arrest and during custodial interrogation, innocent and guilty alike  perhaps particularly the innocent  may find the *95 situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply.... He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention. In sum, the inherent pressures of in-custody interrogation exceed those of questioning before a grand jury and compound the difficulty of identifying the reason for silence." (422 U.S., p. 177 [45 L.Ed.2d, p. 105].)
Lower federal courts, prior to the mandates of Griffin and Miranda, had clung to the rule that "`to draw a derogatory inference from mere silence is to compel the [accused] to testify; [from which it would logically follow that] the customary [federal] formula of warning should be changed, and the [accused] should be told, "If you say anything, it will be used against you; if you do not say anything, that will be used against you."'" (Ivey v. United States (5th Cir.1965) 344 F.2d 770, 773; McCarthy v. United States (6th Cir.1928) 25 F.2d 298, 299.) And: "`Where accusatory statements are made in the presence of a respondent and not denied, the question whether his silence has any incriminating effect depends upon whether he was under any duty or any natural impulse to speak. Sometimes or often, in the earlier stages of the matter, there may be such a duty or impulse; but, after the arrest and during an official examination, while respondent is in custody, it is common knowledge that he has a right to say nothing. Only under peculiar circumstances can there seem to be any duty then to speak. Lacking such circumstances, to draw a derogatory inference from mere silence is to compel the respondent to testify; ...'" (United States v. Pearson (6th Cir.1965) 344 F.2d 430, 431; McCarthy v. United States, supra, 25 F.2d p. 299.)
These latter federal holdings were expressly approved by California's Supreme Court in People v. Cockrell, supra, 63 Cal.2d 659, 670, where it was reiterated that "`after the arrest and during an official examination, while respondent is in custody, it is common knowledge that he has a right to say nothing. Only under peculiar circumstances can there seem to be any duty then to speak. Lacking such circumstances, to draw a derogatory inference from mere silence is to compel the respondent to testify; ... [¶] [T]he same standards must determine whether *96 an accused's silence in either a federal or a state proceeding is justified.'" (Italics added.)
We have been furnished with no authority (and we have found none) holding that evidentiary use of postarrest silence is constitutionally permissible. Nor may it reasonably be said the circumstances here at issue "do not lend themselves to an inference that [Gaines] was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, ..." (People v. Preston (1973) 9 Cal.3d 308, 314 [107 Cal. Rptr. 300, 508 P.2d 300]; People v. Martin (1980) 101 Cal. App.3d 1000, 1007 [162 Cal. Rptr. 133].)
We accordingly find merit in Gaines' instant contentions.

II.
(2) But a related question remains. It is whether the error and misconduct we have found were harmless according to the constitutional criteria of Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].
We relate certain evidence upon which Gaines' conviction was founded.
One morning Raymond Davis, with his small daughter, went to his barbershop. Around noon of the day a person, later identified as defendant Gaines, entered the shop with another who drew and pointed a revolver. Davis raised his hands and told the gunman that there would be no "problems." He was then ordered to a back room of the shop and told by the robbers to empty his pockets, which he did. He produced for them a roll of bills. The robbers then tied him to a chair, using an extension cord, and left the shop. Davis soon extricated himself and ran outdoors where he encountered a friend. The two scouted the neighborhood for the robbers without success, and then returned to the shop where they called the police and met another friend of Davis, one Johnson. Johnson had a few minutes before seen two men run, laughing, from the barbershop and had followed them in his car. He had seen them get into an automobile and then leave it to enter a bus numbered "659." Davis, Johnson and others got into Johnson's car, followed the bus route, and soon caught up with the bus, which they boarded. Davis, observing the two robbers, shouted at them, "You robbed me, you *97 robbed me," but when he and a companion observed a gun in Gaines' accomplice's hand, he shouted, "He's got a gun, everybody."
The warning was followed by an exodus of many of the bus' passengers, the two robbers, and Davis and his companions who, with an arriving police officer, continued pursuit of the robbers. A few minutes later the robbers were observed and chased into a building, where the officer cornered them in an alley and arrested them. The handgun and stolen money had been discarded somewhere in their flight. Davis identified the two as the robbers at the time of their arrest and again at the trial.
At the trial, as noted, Gaines testified; his accomplice did not. Gaines explained that he had in the past sold marijuana to Davis, and that he and his companion, on the day of their arrest had entered the barbershop hoping to make another such sale. Negotiations and testing of the marijuana were followed by Davis' remark that "it wasn't as good as the last he had bought." A dispute started which culminated with Davis producing a handgun, and robbing Gaines of his marijuana. Gaines was then pushed to the door and told to "get on," which he and his companion did. The two ran off, and continued their flight because they were afraid Davis was going to shoot them. And Gaines had fled from the police officer because he was an escapee from a juvenile hall facility.
We have considered the foregoing evidence, as well as the entire record of the trial. We conclude that the error and misconduct found in part I above were harmless beyond a reasonable doubt, according to the standards of Chapman v. California, supra, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].

III.
In addition to charging the crime of which Gaines was convicted the information, as authorized by Penal Code section 12022, subdivision (a), alleged that "during the commission and attempted commission of the above offense the said ... Gaines was armed with a firearm, to wit: a handgun."
(3) In its related jury instructions the trial court stated: "I now instruct you that the word `firearm' includes a handgun, and that the firearm need not be operable, ..." (Italics added.) Gaines, arguing that *98 the statute requires the firearm to be operable, charges error.
We are concerned with statutes such as Penal Code sections 12021 (possession of a concealable firearm by an ex-convict) and 1203, 12022 and 12022.5, which enhance the punishment of those convicted of felonies in the perpetration of which they used or were armed with firearms. The statutes constitute a legislative response to the widespread infliction of death and bodily injury by the use of such weapons in crimes of violence throughout the state and nation. (See People v. Grubb (1965) 63 Cal.2d 614, 620 [47 Cal. Rptr. 772, 408 P.2d 100].) And we are unable reasonably to discern legislative purpose that as to some of the statutes the firearms be operable and as to others, not operable.
Some authority holds that such firearms, for the infliction of the greater penalty, need not be operable. It has been said that nothing in the "language [of Penal Code section 12022.5] expressly requires that the firearm be in operable condition" (People v. Jackson (1979) 92 Cal. App.3d 899, 901 [155 Cal. Rptr. 305]), and that "the trial court's instructions to the jury that operability of the weapon [on a Penal Code section 12021 charge] was not an issue were correct" (People v. Thompson (1977) 72 Cal. App.3d 1, 5 [139 Cal. Rptr. 800]). And see People v. Favalora (1974) 42 Cal. App.3d 988, 993-994 [117 Cal. Rptr. 291].
But the greater and more persuasive authority, we opine, is to the contrary. Thus it is held that "Penal Code section 12022.5 ... is applicable to any person who uses an operable firearm in the commission of a robbery or an attempted robbery" (People v. Torres (1971) 19 Cal. App.3d 724, 733 [97 Cal. Rptr. 139], italics added); "It is not a violation [of section 12021] to carry a pistol that is so broken or out of repair that it cannot be used to shoot with" (People v. Jackson (1968) 266 Cal. App.2d 341, 348 [72 Cal. Rptr. 162], italics added); and, "the purpose of that statute was `to make it unlawful for ex-convicts to carry a gun that will shoot'" (People v. Norton (1978) 80 Cal. App.3d Supp. 14, 25 [146 Cal. Rptr. 343], italics added; People v. De Falco (1959) 176 Cal. App.2d 590, 593 [1 Cal. Rptr. 578]). And any doubt as to the controlling authority of today will be resolved by the recent high court opinion of People v. Woodard (1979) 23 Cal.3d 329, 340 [152 Cal. Rptr. 536, 590 P.2d 391], holding, in a case concerning Penal Code section 12021, that "in addition to the accused's status are [the elements of] his ownership or possession of an operable [italics added], concealable firearm...."
*99 But nevertheless it appears that a contention of such a firearm's inoperability is in the nature of a special defense, the burden of establishing which is upon the accused. "`[F]or practical reasons the burden of explanation or of going forward with the evidence is sometimes placed on a party-opponent who has information lacking to the one who asserts and seeks to establish a fact.'" (People v. Ambellas (1978) 85 Cal. App.3d Supp. 24, 34 [149 Cal. Rptr. 680]; and see Morris v. Williams (1967) 67 Cal.2d 733, 760 [63 Cal. Rptr. 689, 433 P.2d 697].) This evidentiary principle is frequently used in our criminal law. It will be applied where the accused contends that a prior conviction is invalid for lack of an attorney's presence (People v. Coffey (1967) 67 Cal.2d 204, 217 [60 Cal. Rptr. 457, 430 P.2d 15]; People v. Witt (1971) 15 Cal. App.3d 6, 12 [92 Cal. Rptr. 770]); or that he was entrapped (People v. Terry (1955) 44 Cal.2d 371, 372 [282 P.2d 19]; People v. Braddock (1953) 41 Cal.2d 794, 803 [264 P.2d 521] [cert. den., 348 U.S. 837 (99 L.Ed. 660, 75 S.Ct. 27)]); or, in a controlled substance case, that he had a physician's prescription (People v. Bill (1934) 140 Cal. App. 389, 393 [35 P.2d 645]); or that he did not himself tamper with the identification marks of a firearm possessed by him (People v. Scott (1944) 24 Cal.2d 774, 782-783 [151 P.2d 517]; People v. Nelson (1969) 2 Cal. App.3d 738, 741 [83 Cal. Rptr. 6]). The principle acts as a sort of evidentiary presumption which must be overcome by the accused. (See People v. Scott, supra, pp. 779-783; People v. Nelson, supra, p. 741.)
Thus it has been held in cases such as that before us, that there is "no requirement upon the People ... to prove [the gun] was operable" (People v. Williams (1976) 56 Cal. App.3d 253, 255 [128 Cal. Rptr. 408]); the defendant himself in such a case is required to raise "a reasonable doubt" as to his special defense (People v. Scott, supra, 24 Cal.2d 774, 783); and the "burden of proof" lies with the defendant (People v. Coffey, supra, 67 Cal.2d 204, 217; People v. Sunday (1969) 275 Cal. App.2d 473, 477 [79 Cal. Rptr. 752]). When the burden is not met, the People's "prima facie showing" will be sufficient. (People v. Nugent (1971) 18 Cal. App.3d 911, 915 [96 Cal. Rptr. 209].) "Further, a demand for affirmative proof of operability would allow the defendant to frustrate the statute [as here] by getting rid of the gun or concealing it. In view of the discerned objective[s] of [such statutes], it is enough that the prosecution produce evidence of a gun designed to shoot and which gives the appearance of shooting capability." (People v. Hayden (1973) 30 Cal. App.3d 446, 452 [106 Cal. Rptr. 348] [disapproved on other *100 grounds in People v. Rist (1976) 16 Cal.3d 211, 222 (127 Cal. Rptr. 457, 545 P.2d 833)].) And where the accused shall himself produce evidence on the point, resolution of the conflict raised by the People's evidence or the inference or presumption therefrom is a factual issue to be resolved by the trier of fact.
The presumption or inference of operability is eminently reasonable, for it may logically be assumed that a gun used or held in such a manner as though it were operable and capable of inflicting injury or death, was in fact operable. It is recognized "that persons who possess the specialized instruments of violence... are ordinarily persons who intend to use them...." (People v. Satchell (1971) 6 Cal.3d 28, 41-42 [98 Cal. Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].)
It follows from what we have said that no evidence having been offered by Gaines, or anyone, that the handgun used in the robbery was inoperable, the trial court was under no duty to instruct the jury that a firearm, under Penal Code section 12022, must be operable. "Jury instructions must be responsive to the issues, which in a criminal case, are determined by the evidence...." (People v. Preston, supra, 9 Cal.3d 308, 319.) No prejudice resulted from the court's instruction "that the firearm need not be operable" although, as we have concluded, it did not correctly state the law.

IV.
Gaines finally contends entitlement to "good time/work time" credit earned under Penal Code section 4019 during the period of his presentence confinement.
The contention relates to the credit for precommitment jail time served sometimes allowed county jail prisoners. (See People v. Sage (1980) 26 Cal.3d 498, 509, fn. 7 [165 Cal. Rptr. 280, 611 P.2d 874].) We assume that the Department of Corrections will act expeditiously in determining such credit, if any, to which Gaines may be entitled. If such credit as may be due him is not allowed prior to his prison release date as computed with the claimed credit, he may seek relief from the sentencing court which shall thereupon promptly determine, and award, *101 such credit as may be due him. (See In re Hochberg (1970) 2 Cal.3d 870, 875-876, fn. 4 [87 Cal. Rptr. 681, 471 P.2d 1].)
The judgment is affirmed.
Racanelli, P.J., and Grodin, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied April 30, 1980. Bird, C.J., was of the opinion that the petition should be granted.