[Crim. No. 13615.   Second Dist., Div. Five.   Oct. 2, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOE LOUIS JACKSON, Defendant and Appellant.

Belan M. Wagner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

MOOR, J. pro tem.*—Defendant was charged by information with feloniously possessing a concealable firearm after suffering a prior felony conviction (violation of Penal Code section 12021), and also charged with a misdemeanor, unlawful use of narcotics (violation of Health and Safety Code section 11721). Two prior felony convictions also were alleged (Health and Safety Code section 11530 (1964), and Penal Code section 288 (1959)).

Jury trial was waived. The cause was submitted on the testimony contained in the transcript of the preliminary examination and testimony produced at the trial. Defendant was found guilty as charged on each count and the prior convictions alleged were found to be true. Defendant appeals from the judgments.

Sergeant Wanek of the Los Angeles Police Department, narcotic division, received two or three calls in one week from a woman he did not know, who informed him that she was the mother of a 16-year-old girl who was living with defendant in apartment 19 at a certain address under the name of Carolyn Walker; that defendant was selling heroin and that Carolyn had become a prostitute and was using heroin. She left her name and phone number, and Sergeant Wanek subsequently called her back and talked to her. (Carolyn's mother, testifying for the defense, stated that she had not called Sergeant Wanek; had not given him her name and telephone number; that he had not called back and that Carolyn was 19 years of age.)

Sergeant Wanek checked the police files and found that defendant was shown therein as a previous narcotic user; that he lived in the area of the address given by the woman, and that his description in the C.I.I. files exactly matched the description the woman had given.

Sergeant Wanek contacted the juvenile unit to find out whether Carolyn had been reported missing, and relayed all the information the woman had given to him. He had not received any information from the juvenile unit by the last time the woman called. Although he had given them the woman's name and address, they could not contact her.

---

*Assigned by the Chairman of the Judicial Council.

Within two hours after the last call from the woman, Sergeant Wanek and his partner went to the apartment building where she said Carolyn was living with defendant. There was no directory downstairs; they tried to contact the manager but she was not at home; they checked the mailbox for apartment 19 and found no name designating the tenant in that apartment.

The officers went to the apartment and knocked on the door. A male voice answered and asked who was there. They identified themselves as police officers and asked that the door be opened. The party answering did not open the door, "but just walked away without saying another word." The officers kept ringing the doorbell. After about five minutes they heard a toilet flushing.

The officers went outside and around to the back of the apartment house. Defendant was climbing out of a window on the second floor. One officer yelled to him to stop, taking his gun out and pointing it at defendant. Defendant then came out the front door of the apartment. The officers stopped him in the patio of the apartment house.

In response to questions, he said he did not live there and did not have a key; that he had gained entrance by opening a window next to the door. He then opened the window and said, "If you want to go into that apartment you have to climb through the window like I did." He told them that if they wanted to go in, to just go on in. One of the officers then went through the window and opened the door and the other officer and defendant came into the apartment.

As the officers walked into the apartment they came to the living room. From there they saw a glass on the kitchen sink containing a hypodermic needle, syringe and rubber ball attached to it, generally referred to as a "hype kit," used for injecting heroin. Officer Wanek asked defendant about it and he replied, "I use that for penicillin when I'm sick. You can check it, it has penicillin in it."

At that time he was informed that he was under arrest, had a right to remain silent, a right to legal counsel, and that any statements he might make could be used against him in any subsequent criminal proceedings.

Appellant was then asked why he did not answer the door, and he said he did not know who was there; that he was trying to climb out the back window because he was scared; he did not know why he went to the back. In response to a question if it would be all right if the officers searched the

house, he said that he did not care; that he did not live there.

The officers then walked into the bathroom area where they noticed that the top of the toilet bowl was tilted. Upon moving it, they found an automatic pistol in the water at the bottom of the bowl. Sergeant Wanek was being very careful as he removed the pistol and defendant said, ''Don't worry, it isn't loaded.'' It was not. When asked where he got the pistol, defendant first stated that it was not his; then he said he found it and brought it home to give to the girl who lived there; later on he again said it was not his pistol. He admitted placing it in the toilet.

In the bedroom, Sergeant Wanek noticed many little pieces of cut balloons and burnt matches on the rug. He asked defendant if he was using heroin. Defendant said he was just ''chipping'' around, but did not have the habit. His arms were then examined and there were numerous puncture marks seen over the veins on each arm. Later, at the station, a more thorough examination disclosed 59 punctures along the veins. The freshest mark was probably 8 to 12 hours old. Examination of his eye dilation in response to light indicated he was in the first stages of withdrawal. At that time it was the opinion of Sergeant Wanek that he was still under the influence of heroin.

Quite a few items of men's clothing, which defendant identified as belonging to him, were found in the apartment. There also was a warrant notice made out to defendant and a telephone bill made out to Carolyn Walker.

One of defendant's contentions on appeal is that his conviction, both as to the misdemeanor charge, violation of section 11721 of the Health and Safety Code, and the felony conviction, violation of Penal Code, section 12021, was obtained on evidence resulting from an illegal search and seizure. In support thereof he contends that the arrest, search and seizure were without a warrant and came about through information supplied by an informant who was not proven to be a reliable informant. He cites the following cases: *People* v. *Cedeno* (1963) 218 Cal.App.2d 213 [32 Cal.Rptr. 246] ; *People* v. *Dewson* (1957) 150 Cal.App.2d 119 [310 P.2d 162] ; *People* v. *Arter* (1959) 169 Cal.App.2d 439 [337 P.2d 534].

These authorities do not support defendant's contention. His arrest was not directly occasioned by information supplied by an informant and the reliability of the person supplying the information is not a factor in this case.

The police officers, in response to a telephonic complaint that the defendant (whom their records disclosed to be a heroin addict) was supplying a 16-year-old girl with heroin and making a prostitute of her, went to the address given for the purpose of investigating the complaint. There is no evidence to indicate that their purpose was otherwise.

Based on the foregoing evidence the trial court made an express finding that the consent to search the apartment was freely and voluntarily given by the defendant.[1] The fact that defendant told the officers that it would be all right to search the house; that he did not care; that he did not live there does not vitiate the consent. (*People* v. *Lyles,* 260 Cal.App.2d 62, 66-67 [66 Cal.Rptr. 799]; *People* v. *McCoy,* 195 Cal. App.2d 655, 657 [16 Cal.Rptr. 117].) Further, by persistent cross-examination, defense counsel got Officer Wanek to testify that, although defendant changed his story back and forth, he stated at least three times that he lived in the apartment. It is not clear, however, whether any of these statements were made before the officers' entry.

It is immaterial whether at the time of the entry into the apartment the officers had probable cause to arrest defendant. The telephone calls, the significant flushing of the toilet and defendant's attempted unorthodox exit through the window certainly entitled them to detain him for questioning. There was no overbearing police conduct which would force us to conclude that his consent to enter the apartment was not freely given. (*People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal. Rptr. 47, 381 P.2d 927].) Once they were in the apartment, the "hype kit" was in plain sight and a perfectly legal arrest followed. The arrest, in turn, quite apart from any consent, legalized the search of the bathroom.

However, defendant has not contested too seriously his conviction of the misdemeanor charge, but concentrates on the felony charge of violation of section 12021 of the Penal Code. Apart from the alleged illegality of the search and seizure, he makes the point that the only testimony concerning the pistol is to the effect that it was inoperable as a pistol. "Q. [By Mr. Silver] : To your knowledge did anybody discharge that pistol? A. [Sergeant Wanek] : To my knowledge? Q. Yes. A. I don't have any knowledge whether it was used or not. Q. And to this date you do not know whether or not that pistol was in any mechanical working condition, is that right?

---

[1] "And I find that the consent was freely and voluntarily given, expressly find that it was not submission to authority."

A. Just what I read on the envelope. Q. The envelope just gives you initials? A. It says 'Unable to test fire. Hammer fall too weak'."

Defendant also testified to the inoperability of the pistol: "I took the pistol like this. It didn't have no firing pin clip to it. I took it and jacked it off like this, here, and broke it loose. And I seen the firing pin wasn't setting right—off at an angle. I told her the pistol didn't work."

■ The People do not dispute the correctness of the statement in *People* v. *De Falco*, 176 Cal.App.2d 590, 593 [1 Cal. Rptr. 578], that "It is the purpose of the statute to make it unlawful for ex-convicts to carry a gun that will shoot and not merely objects that look like usable guns."

■ Although this precise issue has not been previously passed upon by the California courts, there are several California cases which are of assistance in resolving the problem. In *People* v. *McCloskey*, 76 Cal.App. 227, 230 [244 P. 930], the defendant contended that the weapon involved was an antique and incapable of use as a revolver. "The weapon 'is a 32 caliber short cartridge revolver. . . . Five shots, . . . nickel plated, ivory handle,' with a three-inch barrel and a total length of seven inches. At the time of the trial it was 'quite rusty.' 'If you pull the hammer once it is stuck and will not work any more. . . . And it is necessary to take hold of the trigger and shove the trigger forward to get it to work again.' The sheriff and his deputy both testified that in their opinion the revolver was in such mechanical condition that it could be fired. The former stated that it was doubtful whether the hammer of the revolver would 'strike sufficiently hard to explode those old shells (referring to the three cartridges found with the revolver) but I believe you put new shells in that gun right now and pull the trigger it would go off.' " The court there stated: "The revolver and the cartridges were introduced in evidence and the jurors had the benefit of their examination thereof. It cannot be said that the jury was not justified in concluding, from an inspection of the revolver and the cartridges, together with the foregoing testimony, that the revolver was capable of firing such cartridges. 'Although the courts to some extent differ as to what conditions will destroy the efficiency of a weapon, the rule seems to be established that no matter how disabled a weapon may be, if it still retains its efficiency to such an extent that it may in some manner be used as originally intended, a person carrying such a weapon contrary to law will be held criminally liable. . . .'

(8 R.C.L. 290; Ann.Cas. 1913E, 513; 34 L.R.A. (N.S.) 1174.)''

*People* v. *Boyd,* 79 Cal.App.2d 90 [178 P.2d 797], involved the point whether the pistol in question had a barrel less than 12 inches in length. There, the court held it was incumbent upon the prosecution to establish that, in fact, the pistol barrel did not exceed 12 inches in length after the defendant had introduced evidence that the barrel of the gun was more than 12 inches long.[2] The court there said: ''It was incumbent upon the prosecution to prove beyond a reasonable doubt that the barrel of this gun was less than twelve inches in length. While the evidence here relied on may be sufficient to raise a suspicion it is not, in our opinion, sufficient to establish the required fact beyond a reasonable doubt. In a criminal case, the judgment should rest upon some substantial evidence proving the required facts, and the jury should not be allowed to decide such facts upon mere surmise and conjecture.''

█ We do not question the rule that ''a deadly weapon does not cease to be such by becoming temporarily inefficient, nor is its essential character changed by dismemberment if the parts may be easily assembled so as to be effective.'' (*People* v. *Guyette,* 231 Cal.App.2d 460, 467 [41 Cal.Rptr. 875].)

█ As far as the meager evidence in the case at bar shows, the gun could not be made operable without the procurement of a replacement part.

The only evidence before the court was that the pistol was not in operating condition. It is true that the judge as trier of the facts came to the opposite conclusion, but upon what evidence he based this conclusion is not known. There is nothing in the record to substantiate it.

It is not a violation to carry a pistol that is so broken or out of repair that it cannot be used to shoot with or cannot be fired. (*Farris* v. *State,* 64 Tex.Crim.Rep. 524 [144 S.W. 249]; *People* v. *Simons,* 124 Misc. 28 [207 N.Y.S. 56, 58].)[3]

---

[2] The pistol was not in court, having been thrown into the ocean by the defendant prior to his surrender to the police. The testimony was from the recollection of the defendant and other witnesses and expert testimony of the prosecution concerning the probable length of the barrel.

[3] In *People* v. *Simons* several authorities were discussed as follows: ''In *Farris* v. *State, supra,* the court charged the jury that, if the pistol is so broken or out of repair that it cannot be used to shoot with, or it cannot be fired, it is not a violation of the law to carry the same; and in *Miles* v. *State, supra,* [77 Tex. Cr. R. 597 (179 S.W. 567)] the defendant carried a pistol that would not shoot on account of a defective plunger, which would not strike the cap and explode the cartridge. The trial court there refused to submit to the jury the question of fact as to

■ A pistol which was incapable of being fired because it had a broken firing pin is not a pistol within the statute (*People* v. *Grillo* (1962) 11 N.Y.2d 841 [182 N.E.2d 278]) in the absence of a showing that a workable firing pin was also in the possession of defendant and that a simple substitution of pins would have made the weapon operable. (*People* v. *Guyette, supra,* 231 Cal.App.2d 460.)

■ Defendant's brief casually mentions that the admonition required in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] was not given by the arresting officer. No objections to the introduction of defendant's statements to the officer on *Miranda* grounds were made, either at the preliminary hearing or at the subsequent trial. The objection is not now available to defendant on appeal. (*People* v. *Castro,* 257 Cal.App2d 643, 645-646 [65 Cal.Rptr. 62].)

At the time of sentence in this matter defendant was found to have been in violation of probation in case number 284018. Probation was revoked and he was sentenced to state prison, the sentence to run concurrently with the sentence in case number 320812, the present charge. He has appealed from the judgment in number 284018.

Since we cannot be certain that the court would have sentenced defendant in number 284018, had he been found not

whether the pistol was so defective that it could not be fired, and the conviction was reversed, the appellate court writing:

" 'The decisions are that it is not an offense to carry a pistol, if it is so out of repair that it cannot be fired at all; and this, it seems, would include the fact, if so, that it was so defectively manufactured that it could not be fired at all.'

"To the same effect is *State* v. *Castro, supra,* [119 Mo.App. 265 (95 S.W. 961)] and *Blackburn* v. *State,* 58 Tex.Cr.R. 48 [124 S.W. 666].

"In reversing the judgment of conviction in the *Evins* Case, *supra,* [46 Ala. 88] the court said:

" 'We hold that a pistol, to be within the purview and meaning of the statute and the mischief and evil intended to be prevented must have such a degree of perfectness, as that it may reasonably be carried and used as a weapon. It is not enough that it has a stock, and a barrel that may be loaded and fired off by a match or in some other such way.'

"In *Carr* v. *State, supra,* [34 Ark. 448 (36 Am.Rep. 15)] it is held that, if it is affirmatively shown that the pistol is 'wholly unfit for use,' it rebuts the presumption that the weapon was worn to be used as such.

"The defendant in the *Redus* Case, *supra,* [82 Ala. 53 (2 So. 713)] carried a small pistol, which could be fired by striking it with some object, and the court said that:

" 'Neither completeness, impaired condition, nor efficiency, is a proper subject of inquiry, unless it has lost so many of its parts as to be harmless and worthless as a weapon—ceases to be a firearm. The condition of a pistol may vary, without destroying its essential nature.' "

guilty of the violation of section 12021 of the Penal Code, the judgment in that case must be reversed for the sole purpose of enabling the trial court to exercise its discretion in the light of the present status of that charge and subsequent developments.

The judgment in case number 284018 is reversed to permit reconsideration of revocation of probation only. The judgment in case number 320812 is reversed as to count I and affirmed as to count II.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied October 16, 1968, and respondent's petition for a hearing by the Supreme Court was denied November 27, 1968. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.