[Crim. No. 35035. Second Dist., Div. One. Mar. 31, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER DAVID TALLMADGE, Defendant and Appellant.

**COUNSEL**

Charles V. Weedman for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MARSHALL, J.\*—**

### PROCEDURE

This defendant was charged with four counts:

1. Possession of handguns by a convicted felon (Pen. Code, § 12021).

---

\*Assigned by the Chairperson of the Judicial Council.

2. Possession of a machine gun (Pen. Code, § 12220).

3. Possession of a destructive device (Pen. Code, § 12303).

4. Possession of substances with intent to make a destructive device (Pen. Code, § 12312).

A motion to traverse and quash the search warrant was heard and denied in the Municipal Court for the Malibu Judicial District. A preliminary hearing thereafter was held in the same court and the defendant was held to answer. A motion to dismiss the information and a motion to traverse the warrant were denied. A petition for writ of prohibition was also denied without opinion by the Court of Appeal. A petition for hearing in the Supreme Court met the same fate.

After trial by jury, a mistrial was declared on count 1 (jury unable to reach a verdict); on count 2, defendant was found guilty of possession of two items which the jury found to be machine guns (People's exhibits 5 and 6A); mistrial was declared on count 3 (jury unable to reach a verdict). Defendant was found not guilty of count 4. He appeals from the judgment.

## FACTS

On February 1, 1977, Officer Duncan responded to a burglary call to go to 1646 - 19th Street, Santa Monica, a building owned by defendant. Two female employees of defendant heard a noise on the second floor of defendant's building and a silent burglar alarm was recorded by the police. They left the building, telephoned the police and were present at the building entrance when Duncan arrived. They provided him with keys. He and another officer, Officer Rains, entered, mounted the steps to the second floor, but found that none of the keys fit the door which barred entrance to that level. Duncan testified that he "took [his] penknife and slipped the lock." He found four other locked doors and opened them in the same manner. In the rooms to which the officers thereby gained access were parts of machine guns, pistols, and rifles, as well as considerable ammunition and numerous military training manuals, field handbooks on weapons, and military-tape radios. Officer Rains corroborated Duncan's testimony.

On February 3, 1977, Detective Michael Smith of the Santa Monica Police Department obtained a warrant to search defendant's building for illegal weapons and ammunition. Incorporated into Smith's affidavit was a police report dictated by Duncan. This report described in detail Duncan's earlier search of the building, and included the account of slipping the doorlocks, together with a description of the weapons and ammunition he had seen.

Hollis DeVines, an expert on Schlage locks which were used in all the doors, testified that they contain "dead bolts" and that it would be "impossible" to "trip" or "slip" them with a penknife. He also testified that in any case a "slipped" lock would have scratch marks (unless done with a plastic credit card) and that he found none on the locks which he examined.

Another witness, Paul Mollet, an employee of the defendant, testified that the keys handed to the officers were his and that they would open the second floor doors, although the employee that gave Duncan the keys could not say they would open the doors in question.

The testimony indicated that two machine guns could be assembled from the parts found on the second floor during the search of defendant's building and the jury so found, resulting in the conviction on count 2.

The judge of the preliminary hearing concluded that that part of Duncan's report which dealt with opening the doors with a penknife was a "misstatement" but not a lie. He also declared that Duncan's method of opening the doors was not material as he "had a right to be there, and however he got into the building the point is that which shouldn't disturb the probable cause to issue the search warrant."

CONTENTIONS

Appellant contends that the search warrant should have been quashed and the seized evidence excluded because the affidavit contained deliberately false material statements. (Citing *People v. Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130].) He further argues that the part of the alleged .50 caliber machine gun contended by the People to be a receiver was not a "frame" or "receiver" and therefore not a machine gun. Lastly, he contends that the alleged M 14 rifle was not a machine gun because it was in a disassembled condition

in defendant's possession and could not be easily assembled so as to be effective.

Respondent argues that *People* v. *Cook* is not applicable in that its ruling is not retroactive. The respondent declares that the defendant was properly convicted for possession of a machine gun.

DISCUSSION

I

■ The law is clear that negligent misstatements of fact, if unreasonably relied upon in an affidavit for a search warrant, must be excised from that affidavit and the remaining matter tested to ascertain whether it would support the issuance of such a warrant. (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234].) If, however, such an affidavit is found to contain deliberately false statements of fact, the entire affidavit is tainted and evidence obtained pursuant to the search warrant must be excluded. (*People* v. *Cook* (1978) 22 Cal.3d 67, 75, 86-88 [148 Cal.Rptr. 605, 583 P.2d 130].)

Putting aside the question of *Cook's* retroactive application to searches conducted before *Cook* became final, and examining the evidence as to a deliberate or intentional misstatement by Officer Duncan, we find that it is not convincing. The proof consists primarily of the testimony of DeVines, the lock expert, that it is impossible to "slip" or "trip" the locks on the second floor of defendant's building. DeVines is a long-time (28 years) employee of Schlage Lock Company as a "security consultant." He also testified he has seen a lock slipped "with the use of a plastic credit card," but he apparently contends that this cannot be done with a Schlage lock. Officer Duncan as well as Officer Rains both testified to the contrary. ■ ■■ ■ Duncan declared that he did cause the locks to slip and has done so on prior occasions over the five-year period of his service on the police force.[1]

Duncan also declared that the keys furnished him by the women employees did not work on the second floor doors although Mollet declared that they did.

[1]Testimony by an expert does not demand that it be believed simply because he is an expert. (Pen. Code, § 1127b.) The trier of fact may instead accept a layman's testimony. In fact, the officer may himself qualify as an expert.

Duncan was asked to return to the building and attempt again to open the doors with his penknife. He did return,[2] on May 25, 1977, and was unable to open them. He stated, however, that on May 25th, the molding, "the strike plates" or "flash plates" and the "configuration" were all different than on February 1, 1977, and that molding on the second and fourth doors now prevented the insertion of the knife blade. He also testified that he saw four Schlage boxes sitting on a shelf next to the third door one of them being open. He asked if he could look inside them but the defendant's attorney refused permission. He could see a lock in the open box which appeared to be the same type as that in the door.

As one of the women employees, Lynn Lavaluzzi, testified that she observed Duncan and Rains enter the building and then saw lights come on "on the second floor," it follows that the officers did pass through the first of the doors on the second floor, despite the alleged impossibility of slipping the locks.

The judge sitting on the section 1538.5 motion decided that the officers' statements were a "misstatement," "which [is] not a lie." It was this judge who heard the testimony of both Officers Duncan and Rains. A determination of the trier of the fact, that the officers were not making a deliberate misrepresentation is persuasive.

Furthermore, the judge did not believe the misstatement to be material and found there was sufficient probable cause to issue a warrant. He found it not to be material because "I think he (Duncan) had a right to be there anyway however he got into a building." We share his view. Duncan was in the building in response to the defendant's own silent alarm and the telephone call of defendant's own employee. Duncan "had a right to be there" if he was to apprehend a suspected burglar. *How* he entered then does become immaterial to the issue of reasonable search.

If Duncan's police report contained misstatements, we may inquire whether Smith, the affiant, acted reasonably in relying upon that information. (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at pp. 100-101.)

---

[2]We may well ask, as did counsel on argument before this court, why would he consent to return if he knew he could not open the locks with his penknife? The implication is reasonable that he so agreed because he recollected a previous success in opening the locks.

We hold that it was reasonable to do so. Here Smith had the report of a police officer who had been summoned to investigate a burglary. Not having heard any information as to the "unslippable" nature of defendant's door locks, Smith would have no reason to believe that Duncan and Rains had not entered the second floor in the described manner, or to believe that they had not observed the contraband which the report described in detail. Moreover, there is substantial evidence that Duncan had been on the premises on February 1; that he had a right to be there and that he saw articles which were contraband. His report of such observations is not attacked as inaccurate.

Smith's reliance on such report is reasonable. We therefore hold that there is no need to excise any part of the search warrant. As stated in *Theodor*, "to exclude evidence obtained pursuant to a warrant issued on the basis of facts upon which an affiant has reasonably relied...serves no purpose of deterrence to unlawful conduct since, by definition, the affiant has already made a reasonable attempt to comply with the requirements of the Fourth Amendment." (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at p. 97.)

## II

Despite defendant's contention that the .50 caliber machine gun receiver was not a "frame" or "receiver" included under Penal Code section 12200 as "any frame or receiver which can only be used with such weapon," the jury decided in a special finding on count 2 that People's exhibit 5 was such a "receiver" or "frame." The jury heard expert testimony as to what constitutes a receiver, and the expert, Agent Carcenco, identified the exhibit as such. In any event, it is axiomatic that on appeal every fact which can be reasonably deduced from the evidence is assumed to support the judgment. (*People* v. *Farris* (1977) 66 Cal. App.3d 376, 382 [136 Cal.Rptr. 45].) The evidence more than supports the judgment.

Agent Carcenco testified that the receiver was readily assembled into the .50 caliber machine gun and such receiver was only used in a machine gun; it therefore does come within the orbit of Penal Code sections 12200 and 12220.

Defendant also contends that the M 14 (People's exhibit A) rifle was not a machine gun because it was in a disassembled condition and could not be easily assembled so as to be effective. The evidence is

again to the contrary. Officer Ysais assembled the M 14 with parts and tools found at defendant's place of business. He further testified that although the barrel was set loosely into the receiver, it could fire safely. Both Agent Carcenco and Criminologist Dougherty testified that the M 14 was a machine gun and that they test fired it in the automatic mode. Possession of such parts brings defendant under Penal Code sections 12200 and 12220, inasmuch as section 12200 also defines a machine gun as "any combination of parts designed and intended for use in converting a weapon into a machine gun."

As was stated in *People v. Williams* (1929) 100 Cal.App. 149, 151 [279 P. 1040]: "...nor is [a weapon's] essential character changed by dismemberment if the parts may be easily assembled so as to be effective [citation]." The court in *People v. Jackson* (1968) 266 Cal.App.2d 341, 348 [72 Cal.Rptr. 162] agrees with and quotes this rule but declares that a pistol with a broken firing pin would not come within it. This defendant, however, possessed the parts of a machine gun which could be easily assembled and fired and therefore such weapon does come within the rule. Also, Penal Code section 12021 nullified the effect of *Jackson* by making it a crime to possess a frame or receiver. (*People v. Thompson* (1977) 72 Cal.App.3d 1, 4-5 [139 Cal.Rptr. 800].)

Not to treat this as a crime would permit the criminal to own machine gun parts with impunity, to assemble and use it and then disassemble it to reacquire immunity. Surely that was not the legislative intent.

The history of section 12200 of the Penal Code reflects the intent of the Legislature to widen the class of weapons controlled, first by amending the statute to include the terms "frame or receiver" (Stats. 1967, ch. 1281, § 1, p. 3084) and then by adding the language to the statute which relates to conversion of a weapon into a machine gun. (Stats. 1969, ch. 1003, § 1, p. 1974.) The orbit of the amended statute encompasses defendant's conduct.

The judgment is affirmed.

Lillie, Acting P. J., and Hanson, J., concurred.

A petition for a rehearing was denied April 29, 1980, and appellant's petition for a hearing by the Supreme Court was denied June 18, 1980.