Filed 4/7/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EMILIANO GOMEZ,<br><br>    Defendant and Appellant. | H051210<br>(Monterey County<br>Super. Ct. No. 22CR009611) |

The trial court found defendant Emiliano Gomez guilty of stalking, criminal threats, and possession of a firearm and ammunition as a felon, among other offenses. Gomez contends the evidence was insufficient to support his conviction for possession of a firearm as a felon, and he contends the statutes prohibiting felons' possession of firearms and ammunition violate the Second Amendment.

Police found a flare gun in Gomez's possession. Based on an officer's testimony describing the flare gun, the trial court found Gomez guilty of possessing a firearm as a felon under Penal Code section 29800, subdivision (a)(1). We hold this subdivision required the prosecution to prove the flare gun was designed to be used as a weapon. Because the record contains insufficient evidence to support such a finding, we vacate the conviction on that count.

For the reasons set forth in *People v. Anderson* (2024) 104 Cal.App.5th 577 (*Anderson*), we reject Gomez's Second Amendment challenge to the statutory prohibitions on possession of firearms and ammunition by felons.

We reverse the judgment, vacate the conviction for possession of a firearm by a felon, and remand the matter for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged Gomez with seven counts: count 1—stalking (Pen. Code, § 646.9, subd. (a))[1]; count 2—criminal threats (§ 422, subd. (a)); count 3—failure to file a change of address (§ 290.013, subd. (a)); count 4—possession of body armor (§ 31360, subd. (a)); count 5—possession of a firearm by a felon (§ 29800, subd. (a)(1)); count 6—possession of ammunition by a felon (§ 30305, subd. (a)(1)); and count 7—disobeying a court order (§ 166, subd. (a)(4)). As to counts 1 and 2, the prosecution further alleged Gomez was released on bail or his own recognizance at the time he committed the offenses. (§ 12022.1, subd. (b).)

After a bench trial, the trial court found Gomez not guilty on count 4, and guilty on all remaining counts as charged. The court found the special allegations true. The court also found two factors in aggravation: first, that Gomez had prior convictions as an adult and sustained petitions in juvenile delinquency proceedings that were numerous and of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)); and second, that he had engaged in violent conduct indicating he was a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)).

The trial court imposed an aggregate sentence of four years in state prison. The sentence consisted of concurrent two-year terms on each of counts 1, 2, 5, and 6, and a consecutive two-year term for the out-on-bail enhancement.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

### B. Facts of the Offenses

#### 1. Counts 1, 2, and 3

Jane Doe testified that she had been married to Gomez for six years, but they separated in 2017. She moved and did not tell Gomez where she was living. In September and October of 2022, Gomez repeatedly threatened her in text messages and e-mails. He threatened to kill himself and Doe, and he sent her a picture of himself holding a rifle. He also sent her a picture of the outside of her house and said he was outside the house waiting for her. On October 26, Doe saw that someone had broken two pieces of the fence outside her house. She called the police to make a report, and she showed an officer numerous threatening texts and e-mails from Gomez. The police conducted a records check for Gomez's listed address and searched the residence, but he was no longer living there.

#### 2. Count 4

In September 2022, Gomez was driving an SUV when the police stopped him for speeding. The police subsequently searched the SUV and found an Airsoft rifle, a pellet rifle, a starter pistol loaded with blanks, a ballistic helmet, and a vest with metal plates inside it.

#### 3. Counts 5, 6, and 7

In November 2022, police saw Gomez coming and going at a different address and they obtained a search warrant for that apartment. In the search, police found seven live rounds of nine-millimeter ammunition and various indicia associated with Gomez. In a small unlocked storage space, the police found firearm holsters, a BB gun rifle, and an unloaded Orion flare gun.

An officer testified that he personally examined the flare gun, that it appeared to be in working order, and that it was capable of firing. The officer testified that the flare gun had an intact frame or receiver, and that it was designed to expel a projectile through the barrel using the force of an explosion or some other form of combustion. On cross-

3

examination, defense counsel asked whether "a flare gun is a firearm," and the officer responded, "Per the Penal Code definition, yes." The police did not find any flares for the gun. The prosecution did not introduce the flare gun or any photographs of it into evidence.

### 4. Testimony of Emiliano Gomez

Gomez testified that he did not live at the apartment at the time of the November 2022 search, and he said he was living at his sister's house instead. He testified that he had spent time at the apartment in the week before the search, and he had moved some of his belongings into it because he was planning to move there. Gomez said more than three or four people were living at the apartment, and he had spent the night there "once or twice." He described the apartment as a "trap house," which is a place where people go to stay and use drugs.

Gomez denied the flare gun and ammunition were his. On cross-examination, he conceded he was out of custody on bail at the time of the search, and that he had been admonished by the court not to possess firearms or ammunition.

## II. DISCUSSION

### A. Sufficiency of the Evidence for Possession of a Firearm by a Felon

The trial court found Gomez guilty of possession of a firearm as a felon based on his possession of the flare gun. Gomez contends the evidence was insufficient to prove he was in possession of a firearm because there was no evidence the flare gun was "designed to be used as a weapon" under the definition of "firearm" set forth in section 16520, subdivision (a). The Attorney General argues the officer's testimony supported the conviction because possession of a frame or receiver is sufficient to prove possession of a firearm under section 16520, subdivision (b).

4

### 1. Legal Principles

#### a. Standard of Review

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citing *People v. Maury* (2003) 30 Cal.4th 342, 403.)  The record must disclose substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*)  The substantial evidence must be reasonable, credible, and of solid value. (*Ibid.*)  We review the evidence "in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]" (*Ibid.*)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid.*)  The standard is the same under both the California Constitution and the federal Constitution. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

#### b. Statutory Background

Section 29800, subdivision (a)(1) provides, in relevant part, "Any person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

Section 16520, subdivisions (a) and (b) set forth the definition of "firearm" as used in section 29800.  Subdivision (a) defines "firearm" as "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion." (§ 16520, subd. (a).)  Subdivision (b) further provides, in

relevant part, " 'firearm' includes the frame or receiver of the weapon, including both a completed frame or receiver, or a firearm precursor part."[2] (§ 16520, subd. (b).)

The Legislature added section 16520 and section 29800 to the Penal Code in 2010 with the enactment of Senate Bill No. 1080 (Senate Bill 1080), the Deadly Weapons Recodification Act of 2010. (Stats. 2010, ch. 711, § 6, eff. Jan. 1, 2012.) Senate Bill 1080 reorganized former section 12001 et seq. without substantively changing the law. (See Nonsubstantive Reorganization of Deadly Weapon Statutes, 38 Cal. Law Revision Com. Rep. (2009) p. 217.) "Nothing in the Deadly Weapons Recodification Act of 2010 is intended to substantively change the law relating to deadly weapons. The act is intended to be entirely nonsubstantive in effect." (§ 16005.)

Former section 12021 was the predecessor statute to section 29800. Senate Bill 1080 continued former section 12021, subdivision (a) without substantive change by adding section 29800, subdivision (a). (Stats. 2010, ch. 711, §§ 4, 6, 9.)

Former section 12001 was the predecessor statute to section 16520. Before Senate Bill 1080 took effect, former section 12001, subdivision (b) contained the language now found without change in section 16520, subdivision (a). Senate Bill 1080 repealed former section 12001 and reenacted it in its current version, providing, "As used in this title, 'firearm' has the meaning provided in subdivision (a) of Section 16520." (§ 12001; Stats. 2010, ch. 711, § 5, eff. Jan. 1, 2012.) Former section 12001, subdivision (c)

---

[2] "A *receiver* is 'the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached.' " (*Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1147, fn. 6, quoting Webster's 3d New Internat. Dict. (1965) at p. 1894.) As defined by federal regulations, "[i]n essence, the receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that 'houses the hammer, bolt, or breechblock, as well as the firing mechanism.' " (*California v. Bureau of Alcohol, Tobacco, Firearms, and Explosives* (N.D. Cal. 2024) 718 F.Supp.3d 1060, 1065.)

contained the phrase " 'firearm' includes the frame or receiver of the weapon," which is now included in section 16520, subdivision (b).[3] (Stats. 2007, ch. 163, § 1.)

### c.  Principles of Statutory Construction

" ' " ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]  'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " [Citation.]' "  (*People v. Braden* (2023) 14 Cal.5th 791, 804 (*Braden*).)

"In determining [the Legislature's] intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided."  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 (*Dyna-Med*).)

### 2.  The Evidence Was Insufficient to Prove the Flare Gun Was a Firearm

Gomez does not dispute that sufficient evidence proved he was in possession of the flare gun, and that he was a felon at the time.  He contends only that the prosecution

---

[3] Other language in subdivision (b) of section 16520 has been amended since it was first enacted, but the changes are immaterial to our analysis.

failed to prove the flare gun was a firearm because there is no evidence in the record that the flare gun was "designed to be used as a weapon" under the definition of "firearm" set forth in section 16520, subdivision (a). The Attorney General contends the evidence was sufficient based on the police officer's testimony that the flare gun had an intact frame or receiver, and that it was designed to shoot a projectile through its barrel using the force of an explosion or some other form of combustion.

Although the police officer testified that "a flare gun" is a firearm, "per the Penal Code," nothing in California statutes or caselaw defines a flare gun as a firearm as a matter of law. (See *People v. Lawson* (1987) 189 Cal.App.3d 741, 748 ["Even such a simple concept as 'a gun is a firearm,' must be conveyed to the jury in definitional terms so as to permit the jury to apply the instruction in its factfinding/law-applying function."]; *Medley v. Runnels* (9th Cir. 2007) 506 F.3d 857, 864 [by instructing the jury that a flare gun is a firearm, California trial court did not permit the jury to make the factual determination as to whether the flare gun used by defendant was designed to be used as a weapon and expels a projectile through a barrel by the force of an explosion].) The trial court could not rely on the officer's testimony to the contrary.

### a. Statutory Interpretation of Penal Code Section 16520

Apart from the police officer's testimony, the Attorney General cites nothing in the record showing the flare gun was designed to be used as a weapon. The Attorney General contends it was sufficient to show the flare gun had an intact frame or receiver, and that it was designed to expel a projectile through the barrel using the force of an explosion or some other form of combustion. But as Gomez points out, applying the statute in that fashion would render the phrase "designed to be used as a weapon" surplusage in subdivision (a) of section 16520. "A construction making some words surplusage is to be avoided." (*Dyna-Med*, *supra*, 43 Cal.3d at p. 1387.)

The Attorney General relies on *People v. Arnold* (2006) 145 Cal.App.4th 1408 (*Arnold*). In *Arnold*, the police found a model 77 Ruger .22-caliber rifle in Arnold's

8

possession, and he was convicted of possession of a firearm as a felon under former section 12021, subdivision (a)(1). (*Id.* at pp. 1410-1411.) Pieces of the rifle were missing, it had been burned, and it was "possibly melted." (*Id.* at p. 1414.) At trial, a detective identified the barrel of the gun, the bolt, and other parts. On appeal, Arnold argued the evidence was insufficient to show he was in possession of a firearm because the evidence did not establish he possessed the frame or receiver of the rifle. (*Id.* at p. 1413.)

The Court of Appeal construed former section 12001 to mean the prosecution was not required to prove Arnold possessed the frame or receiver of the rifle. Based on the wording of former section 12001, subdivision (c)—" '*includes* the frame or receiver of the weapon,' (Italics added [ ])"—the Court held this language "*enlarges*, rather than limits, the definition of 'firearm' in [former section 12001,] subdivision (b). This means that . . . possession of a 'frame or receiver' is *sufficient* to constitute possession of a 'firearm,' *regardless* of whether a 'device' with a 'barrel' is also possessed. [¶] Conversely, [former section 12001,] subdivision (c)'s definition of a firearm as 'including' a 'frame or receiver' does not place upon the word 'firearm' a meaning 'limited to' devices that include frames or receivers. [Citation.]" (*Arnold, supra,* 145 Cal.App.4th at p. 1414.) The Court rejected the argument that "the 'device' described in [former section 12001,] subdivision (b) *must* include a 'frame or receiver' as well as a barrel." (*Ibid.*) "Although possession of a receiver is sufficient, it is not necessary to a conviction." (*Ibid.*)

The Attorney General cites *Arnold* for the proposition that possession of a frame or receiver is sufficient to constitute possession of a "firearm." This implies the prosecution was not required to prove the elements set forth in section 16520, subdivision (a). We do not read *Arnold* so broadly. The *Arnold* Court did not construe former section 12001, subdivision (c) as dispensing with the requirement that the prosecution prove the possessed device is "designed to be used as a weapon" as long as

9

the defendant possesses a frame or receiver. To the contrary, in rejecting Arnold's argument that the rifle had been rendered inoperable by the fire damage, the Court noted that section 12001 reflected a legislative intent to " 'prohibit possession by an ex-felon of an inoperable ... firearm, that is, one which *although designed to be used as a weapon* is presently incapable of being fired.' " (*Arnold*, *supra*, 145 Cal.App.4th at pp. 1415-1416, italics added, quoting *People v. Nelums* (1982) 31 Cal.3d 355, 358 (*Nelums*).)

The plain text and structure of section 16520 also undercut the Attorney General's interpretation. Under subdivision (a) of section 16520, a "firearm" is defined in part as "a device, designed to be used as a weapon," and subdivision (b) provides in part that " 'firearm' includes the frame or receiver of *the weapon . . . .*" (Italics added.) Viewing these subdivisions together, the most natural reading is that "the weapon" in subdivision (b) refers to the device "designed to be used as a weapon" in subdivision (a). In other words, a defendant may be convicted for possessing only the frame or receiver of a weapon, but the prosecution must prove the frame or receiver is that part of a device meeting the elements of "firearm" set forth in subdivision (a).

Furthermore, section 16520, subdivision (c) expands the definition of "firearm" to expressly include devices designed for emergency signaling purposes: "As used in the following provisions, 'firearm' also includes a rocket, rocket propelled projectile launcher, or similar device containing an explosive or incendiary material, whether or not the device is designed for emergency or distress signaling purposes . . . ." This subdivision—which does not use the word "weapon"—shows the Legislature knew how to include non-weapon devices designed for emergency or distress signaling purposes in the definition of a "firearm." However, this subdivision does not include section 29800 in its list of covered provisions. Under the canon of statutory construction, *expressio unius est exclusio alterius*, "the explicit mention of some things in a text may imply other matters not similarly addressed are excluded. [Citations.]" (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.) The exclusion of section 29800 from

10

section 16520, subdivision (c)—and likewise, the omission of language including devices designed for emergency or distress signaling purposes from subdivision (a)—support the conclusion that a "firearm" under section 29800 must be a device designed to be used as a weapon.

To the extent the plain language of the statute may be ambiguous, we may look to the legislative history and purpose of the statute. (*Braden*, *supra*, 14 Cal.5th at p. 804.) The legislative history of the predecessor statute (former § 12001) supports the above interpretation. The statutory language including "the frame or receiver" first appeared in 1969, when the Legislature amended the definition of prohibited devices in former section 12001. Prior to the 1969 amendment, former section 12001 provided in full, " 'Pistol,' 'revolver,' and 'firearm capable of being concealed upon the person' as used in this chapter apply to and include *any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion*, and which has a barrel less than 12 inches in length." (Stats. 1967, ch. 1361, § 1, italics added.) The 1969 amendment appended the following language to former section 12001: " 'Pistol,' 'revolver,' and 'firearm capable of being concealed upon the person' as used in Sections 12021, 12072, and 12073 include the frame or receiver *of any such weapon*." (Stats. 1969, ch. 1002, § 1, italics added.) The plain language of this code section made it clear that the phrase "include the frame or receiver of *any such weapon*" referred to the weapon as defined by the preceding terms, including, "any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion." (Former § 12001, italics added; Stats. 1969, ch. 1002, § 1.)

A majority of the courts of appeal interpreted the 1969 amendment as a legislative response to *People v. Jackson* (1968) 266 Cal.App.2d 341, in which the Court of Appeal reversed a conviction for possession of a concealable firearm by a felon where the gun could not be made operable without replacing part of it. (See *People v. Thompson* (1977) 72 Cal.App.3d 1, 4 [collecting cases discussing the purpose of the 1969 legislative

amendment to section 12001].)  In *Nelums*, *supra*, 31 Cal.3d 355, the California Supreme Court endorsed this interpretation:  "The issue as to possession by an ex-felon [citation] was simplified by a 1969 amendment to section 12001 which now includes the possession of 'the frame or receiver' of a concealable weapon as possession of a 'firearm capable of being concealed upon the person' within section 12021.  The amendment evidences an apparent legislative intent to prohibit possession by an ex-felon of an inoperable concealed firearm, that is, one which although designed to be used as a weapon is presently incapable of being fired.  [Citations.]"  (*Id*. at p. 358.)

In 1982, the Legislature divided former section 12001 into subdivisions. Subdivision (a) included the definitions set forth in prior versions—as relevant here, " 'firearm capable of being concealed upon the person' shall apply to and include any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion, and which has a barrel less than 12 inches in length." (Former § 12001, subd. (a); Stats. 1982, ch. 1321, § 1.)  The language previously added by the 1969 amendment was moved to subdivision (b) as follows:  "As used in Sections 12021, 12072, and 12073, the terms 'pistol,' and 'firearm capable of being concealed upon the person' include the frame or receiver of any such weapon." (Former § 12001, subd. (b); Stats. 1982, ch. 1321, § 1.)  The term "weapon" did not appear in any other part of the code section.  This implied the phrase "include the frame or receiver of any such weapon" still applied to the terms defined by subdivision (a), as in the previous, undivided version of the code section.

In 1990, the Legislature amended former section 12001 to insert a new version of subdivision (b) providing, "As used in this chapter, 'firearm' means any device, designed to be used as a weapon, from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion." (Stats. 1990, ch. 9, § 1.5.)  This definition of "firearm" is now contained in section 16520, subdivision (a).  The amendment also inserted a new version of section 12001, subdivision (c) to provide, in

12

relevant part, "As used in Sections 12021, . . . the term 'firearm' includes the frame or receiver *of any such weapon*." (Stats. 1990, ch. 9, § 1.5, italics added.) This implied the phrase "any such weapon" referenced the term "firearm" as defined in subdivision (b).

In 1994, the Legislature amended former section 12001, subdivision (c) to provide, in relevant part, "As used in Sections 12021, . . . the term 'firearm' includes the frame or receiver *of the weapon*." (Stats. 1994, ch. 23, § 3, italics added.) This amendment changed the phrase "any such weapon" to "the weapon." Former subdivision (b) of section 12001 continued unchanged from the previous version. (Stats. 1994, ch. 23, § 3.) Legislative materials provide no substantive analysis of the amendment that changed "any such weapon" to "the weapon" in subdivision (c). The change was made in a late round of Senate Floor amendments described in the bill analyses as adding "technical clean-up language." (Sen. Floor Analysis, 3d reading of Assem. Bill No. 482 (1993-1994 Reg. Sess.) Jan. 20, 1994, p. 2.) We think it is unlikely the Legislature intended to make an expansive change to the definition of "firearm" in former section 12001 with no substantive analysis and no mention of a change in the definition.

We conclude from the above that section 16520, subdivision (b) does not exclude the elements of subdivision (a), and that the prosecution was therefore required to show the flare gun was "designed to be used as a weapon." But even if we interpreted subdivision (b) of section 16520 as prohibiting the possession of a frame or receiver notwithstanding the requirements of subdivision (a), subdivision (b) refers to "the frame or receiver of the *weapon*." (Italics added.) The record would still have to include sufficient evidence showing the flare gun possessed by Gomez was a "weapon."

### b. The Evidence Was Insufficient to Prove the Flare Gun Was Designed to Be Used as a Weapon

We are unaware of any applicable statute defining "weapon," and the parties do not cite any. We therefore presume the Legislature intended for it to have its "ordinary meaning." (*Make UC a Good Neighbor v. Regents of University of California* (2024)

13

16 Cal.5th 43, 58.)  Dictionary definitions of "weapon" include:  "An instrument used or designed to be used to injure or kill someone," (Black's Law Dict. (12th ed. 2024)); "1: something (such as a club, knife, or gun) used to injure, defeat, or destroy; 2: a means of contending against another," (Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/weapon> [as of Apr. 7, 2025], archived at: <https://perma.cc/66SV-9NGR>); and, "An instrument of attack or defense in combat, as a gun, missile, or sword," (American Heritage Dict. (5th ed. 2011) p. 1961).  The Attorney General points to no evidence in the record that would reasonably support an inference the flare gun in Gomez's possession was used or designed to injure, kill, defeat, destroy, attack or defend against an attack in combat, or contend against any person.

As a general matter, flare guns are designed for use by boat operators for emergency purposes.  "A flare gun is an emergency signalling device employed predominantly aboard boats to expedite rescue efforts." (*State v. Rackle* (1974) 55 Haw. 531, 537 (*Rackle*).)  "The purpose of the device is to enable boat operators to send visual distress signals to expedite rescue efforts.  Devices suited for such a purpose, including hand-held red flare distress signals, are required by the United States Coast Guard on certain classes of boats." (*Com. v. Sampson* (1981) 383 Mass. 750, 754 (*Sampson*).) Federal regulations set forth specifications for flare guns usable for such purposes.  (See, e.g., 46 C.F.R. § 160.028-2 ["Signal Pistols for Red Flare Distress Signals"].)

Courts from several other jurisdictions have held that flare guns do not constitute "weapons" under the ordinary meaning of that word.  "[T]he record establishes that the distress flare launcher is not an instrument designed for attack or defense.  The firearms expert testified that, according to the manufacturer, the distress flare launcher has two potential purposes: signaling others for assistance and ensuring that firefighters can ignite wildfires.  Moreover, the State concedes that the distress flare launcher here was 'designed to be used in emergency situations as [an] alert mechanism[ ].'  Accordingly, we hold that the distress flare launcher here is not a weapon and, thus, cannot be a

14

firearm under [Minnesota law]. (*State v. Glover* (Minn. 2020) 952 N.W.2d 190, 194, fn. omitted.) "The flare device at issue here is not a weapon by design. [Citations.] The signal device thus has a legitimate, noncombative design and purpose." (*Sampson*, *supra*, 383 Mass. at p. 754, fn. omitted.) "[F]lare guns are not weapons within the ordinary understanding of the term and thus should not properly be considered firearms under the regulation." (*Mars Equipment Corp. v. U.S.* (N.D. Ill. 1977) 437 F.Supp. 97, 100.) "A flare gun is an emergency signalling device employed predominantly aboard boats to expedite rescue efforts. It is not a weapon, the carrying of which would be proscribed by the statute under consideration." (*Rackle*, *supra*, 55 Haw. at p. 537.)

The Attorney General cites cases from another jurisdiction holding flare guns are firearms, but these cases rely on a state law definition of "firearm" that does not refer to the device being designed to be used as a weapon. (See *Morris v. Commonwealth* (2005) 269 Va. 127, 132, fn. omitted [flare gun satisfied the definition of "firearm" because it was "designed, made, and intended to expel a projectile by means of an explosion"]; *Quesenberry v. Commonwealth* (Va. Ct. App. 2003) 41 Va.App. 126, 129 [same].) (See also *Emmons v. State* (Fla. Dist. Ct. App. 1989) 546 So.2d 69, 71 [flare gun satisfied the definition of "firearm" because it was "designed to and was actually capable of expelling a projectile by means of an explosive device"].)

We need not decide whether flare guns as a general matter are "weapons" or designed to be used as weapons under the ordinary definition of the word. The question here is narrower: whether the evidence supported a finding that the flare gun in Gomez's possession was a firearm within the meaning of section 29800, subdivision (a)(1), and section 16520, subdivisions (a) and (b)—including a finding that the device was designed to be used as a weapon.

The Attorney General correctly points out that, under the substantial evidence standard, "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th

47, 60.) But such deductions must be based on "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*Ibid.*)

Neither the flare gun nor any photographs of it were in evidence. The record establishes only that the flare gun was capable of firing; that it was designed to expel a projectile through the barrel using the force of an explosion or some other form of combustion; and that it had an intact frame or receiver. The prosecution did not present any evidence that would reasonably support an inference the flare gun was designed to be used as a weapon. It is relevant to our analysis that multiple courts from other jurisdictions have concluded flare guns as a general matter do not constitute "weapons" within the ordinary meaning of that word. Absent evidence showing otherwise, we cannot conclude a reasonable factfinder could infer beyond a reasonable doubt that the flare gun in this case was designed to be used as a weapon.

For the reasons above, we conclude the evidence was insufficient to support Gomez's conviction on count 5 for possession of a firearm by a felon under 29800, subdivision (a)(1). We reverse the judgment, vacate the conviction on count 5, and remand the matter for resentencing.[4]

### B. *Constitutionality of Prohibitions on Possessing a Firearm and Ammunition as a Felon*

Gomez facially challenges the constitutionality of section 29800, subdivision (a)(1) (possession of a firearm by a felon), and section 30305, subdivision (a)(1) (possession of ammunition by a felon) as violating the Second Amendment under *New*

---

[4] Gomez further contends resentencing is required because the trial court at sentencing failed to consider his service-related post-traumatic stress disorder as a mitigating factor under section 1170.9. The Attorney General asserts Gomez forfeited this claim by failing to object below. Because we must remand for resentencing, this claim is moot; Gomez may present his argument to the trial court at resentencing.

*York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*). The Attorney General contends neither provision violates the Second Amendment.

### 1. *Legal Principles*

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) "The right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.' [Citation.]" (*United States v. Rahimi* (2024) 602 U.S. 680, 690 (*Rahimi*). "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right." (*McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 791 (*McDonald*).) The right therefore applies to state laws governing firearm possession. (*Ibid.*)

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen*, *supra*, 597 U.S. at p. 24.)

In reviewing a facial challenge to the constitutionality of a statute, we consider "only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.]" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) "On a facial challenge, we will not invalidate a statute unless it 'pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' " (*California School Boards Assn. v. State of California* (2019) 8 Cal.5th 713, 723-724, citing *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 338.) A defendant may raise a facial challenge for the first time on appeal. (*In re Sheena K.* (2007) 40 Cal.4th 875, 888-889.)

We review de novo the constitutionality of the challenged statutes.  (*Anderson*, *supra*, 104 Cal.App.5th at p. 584.)

### 2. *Penal Code Section 29800, Subdivision (a)(1) and Penal Code Section 30305, Subdivision (a)(1) Do Not Violate the Second Amendment*

In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the United States Supreme Court held the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."  (*Id.* at p. 592.)  The Court also held, however, "Like most rights, the right secured by the Second Amendment is not unlimited."  (*Id.* at p. 626.)  As relevant here, the Court admonished, "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ."  (*Ibid.*)  In *McDonald*, *supra*, the Court reiterated this point in the context of state law prohibitions on possession of firearms by felons.  (*McDonald*, *supra*, 561 U.S. at p. 786.)

In *Rahimi*, *supra*, the high Court considered the constitutionality of a federal statute prohibiting an individual subject to a domestic violence restraining order from possessing a firearm if the order includes a finding the individual represents a credible threat to the physical safety of an intimate partner, or a child of the partner or individual.  (*Rahimi, supra,* 602 U.S. at pp. 684-685.)  Based on a historical review of traditional surety and "going armed" laws, the Court derived the following principle:  "When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  (*Id.* at p. 698.)  The Court held the federal statute at issue "fits neatly within the tradition the surety and going armed laws represent."  (*Ibid.*)  The Court concluded the Second Amendment did not prohibit the application of the statute to Rahimi.  (*Id.* at p. 700.)  Although the Court conditioned its conclusion on the lower court's finding that Rahimi presented a credible threat to others, the Court again stated a caveat as it had previously stated in *Heller* and *McDonald*:  "[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by

18

categories of persons thought by a legislature to present a special danger of misuse . . . ." (*Id.* at p. 698.)

Several California courts of appeal have published opinions applying the high Court's Second Amendment holdings to the statutes at issue here; all these courts have held the statutes constitutional. A majority of these courts rejected a defendant's challenge on the ground that the Second Amendment only protects the rights of law-abiding citizens. (*People v. Richardson* (2025) 108 Cal.App.5th 1203 [upholding section 29800, subdivision (a)(1) and section 30305, subdivision (a)(1) on the ground that the Second Amendment only protects the rights of law-abiding citizens]; *People v. Ceja* (2023) 94 Cal.App.5th 1296, 1301 [upholding section 30305, subdivision (a)(1) on the same ground]; *People v. Odell* (2023) 92 Cal.App.5th 307, 317 [upholding section 29800, subdivision (a)(1) on the same ground]; *People v. Alexander* (2023) 91 Cal.App.5th 469, 478 [upholding section 29800, subdivision (a)(1) and section 30305, subdivision (a)(1) on the same ground].)

In *Anderson*, *supra*, 104 Cal.App.5th 577, the Court of Appeal upheld the constitutionality of section 29800, subdivision (a)(1) and section 30305, subdivision (a)(1) on a different ground. First, the Court rejected the argument that the Second Amendment right only applies to law-abiding citizens, and the Court concluded Anderson was convicted for conduct presumptively protected by the Second Amendment. (*Id.* at pp. 587-589.) Then, based on a thorough historical review of categorical disarmament laws, the Court concluded, "[H]istorical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence." (*Id.* at p. 598.) (Accord, *People v. Bey* (2025) 108 Cal.App.5th 144.)

Finally, the *Anderson* Court observed that, to prevail against a facial challenge, " 'the Government need only demonstrate that [the statute] is constitutional in some of its

19

applications.' " (*Anderson, supra*, 104 Cal.App.5th at p. 600, quoting *Rahimi, supra*, 602 U.S. at p. 693.) Based on Anderson's own prior convictions—for shooting at an inhabited dwelling or motor vehicle, and assault with a deadly weapon other than a firearm, among other offenses—the Court held, "We have no trouble concluding that in the founding era, he could have been disarmed as punishment for at least one of these crimes." (*Anderson*, at p. 600, fn. omitted.) Accordingly, the Court rejected Anderson's constitutional challenges.

We find the reasoning of *Anderson* persuasive, and we adopt it here. We further note that, like the defendants in *Rahimi* and *Anderson*, the record establishes Gomez has engaged in conduct showing him to be a credible threat to the safety of others. In addition to the stalking and criminal threats convictions in this case, Gomez had suffered prior convictions for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) and sexual assault. Accordingly, for the reasons set forth in *Anderson*, we conclude section 29800, subdivision (a)(1) and section 30305, subdivision (a)(1) do not violate the Second Amendment.

### III.   DISPOSITION

The judgment is reversed, the conviction on count 5 is vacated, and the matter is remanded for resentencing.

20

_____

Greenwood, P. J.

WE CONCUR:

_____

Grover, J.

_____

Wilson, J.

H051210 People v. Gomez

Trial Court:                                    Monterey County
                                                Superior Court No.:  22CR009611


Trial Judge:                                    The Honorable Pamela L. Butler



Attorney for Defendant and Appellant            Michelle D. Spencer
EMILIANO GOMEZ:                                 under appointment by the Court of
                                                Appeal for Appellant



Attorneys for Plaintiff and Respondent          Rob Bonta
THE PEOPLE:                                     Attorney General of California

                                                Lance E. Winters
                                                Chief Assistant Attorney General

                                                Jeffrey M. Laurence
                                                Senior Assistant Attorney General

                                                Amit Kurlekar
                                                Deputy Attorney General

                                                Christen Somerville
                                                Deputy Attorney General

H051210
People v. Gomez